### IN THE UNITED STATES DISTRICT COURT FOR
### THE MIDDLE DISTRICT OF FLORIDA,
### ORLANDO DIVISION

**ALLIANCE OF AUTOMOTIVE SERVICE PROVIDERS, INC., et al**      **PLAINTIFFS**

**VS.**                                                **CAUSE NO:6:14-CV-6020**

**ERIE INSURANCE EXCHANGE and ERIE**
**ERIE INSURANCE COMPANY**                              **DEFENDANTS**

---

### FIRST AMENDED COMPLAINT
### JURY TRIAL DEMANDED

---

COME NOW, Plaintiffs in the above-captioned cause and submit this, their Amended Complaint, pursuant to the Federal Rules of Civil Procedure, and the Orders of this Court entered 17 August, 2015, and September 15, 2014 (Docket No. 42, 6:14-md-2557) and other applicable authority and file this, their Amended Complaint against the above-captioned Defendants, and in support thereof, states the following:

### AMENDMENTS TO PARTIES

1.      Plaintiff, Alan's Auto Center & Leasing Corp. d/b/a Alan's Collision Center, has been withdrawn as a party to this Amended Complaint.

### JURISDICTION AND VENUE

2.      Original jurisdiction and venues exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiffs assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## PARTIES

3.      Plaintiff, Alliance of Automotive Service Providers, Inc., is a Pennsylvania corporation licensed to do business and is doing business at 2151 Greenwood Street, Harrisburg, Pennsylvania 17104.

4.      Plaintiff, Juniper Auto Body, Inc. is a Pennsylvania corporation licensed to do business and is doing business at 1116 N. West End Boulevard, Quakertown, Pennsylvania 18951.

5.      Plaintiff, L.I.P. Collision, Inc. is a  Pennsylvania corporation licensed to do business and is doing business at 320 Elm Avenue, North Wales, Pennsylvania 19454.

6.      Plaintiff, Total Performance Automotive, LLC is a Pennsylvania limited liability company register to do business and is doing business at 283 N. Main Street, Ambler, Pennsylvania 19002.

7.      Plaintiff, Professional, Inc., d/b/a Professionals Auto Body, is a Pennsylvania corporation licensed to do business and is doing business at 1109 Plank Road, Duncansville, Pennsylvania 16635 and 419 E. Pleasant Valley Boulevard, Altoona, Pennsylvania 16602.

8.      Plaintiff, Nigro's Auto Body, Inc. is a Pennsylvania corporation licensed to do business and is doing business at 939-41 Washington Avenue, Philadelphia, Pennsylvania 19147.

9.      Plaintiff, Opeka Auto Repair Co., Inc. is a Pennsylvania corporation licensed to do business and is doing business at 440 Valley Brook Road, McMurray, Pennsylvania  15317.

10.      Plaintiff, Kilkeary's Auto Body, Inc. is a Pennsylvania corporation licensed to do business and is doing business at 647 Thomas Road, Eighty Four, Pennsylvania 15330.

11.      Plaintiff, Hayes Auto Body, Inc. is a Pennsylvania corporation licensed to do

2

business and is doing business at 115 Schoolhouse Road, Souderton, Pennsylvania  18964.

12.    Plaintiff, Classic Auto Body, Ltd. is a Pennsylvania limited company registered to do business and is doing business at 505 Lancaster Avenue, Haverford, Pennsylvania 19041.

13.    Defendant, Erie Insurance Exchange, is a Pennsylvania insurance exchange for which Erie Indemnity Company stands as attorney-in-fact. This Defendant's address, as reported to the Pennsylvania Department of Insurance, is 100 Erie Insurance Place, Erie, Pennsylvania 16530.  (hereinafter referred to as Erie or the Erie Defendants).

14.    Defendant, Erie Insurance Company, is an insurance company registered with the Pennsylvania Insurance Department to do business within the state of Pennsylvania whose headquarters is located at 100 Erie Insurance Place, Erie, Pennsylvania 16530.  (hereinafter referred to as Erie or the Erie Defendants).

## FACTS

15.    Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

16.    Plaintiffs perform repairs on vehicles primarily garaged at locations throughout the State of Illinois.

17.    Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Pennsylvania, , and payment of claims to third-party claimants, resident both within or without the State of Pennsylvania.

18.    The Plaintiff body shops have done business at various times over the course of years with the Defendants'  policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair services.

19.    Each Defendant is individually responsible for payment for those repairs for their

3

respective policyholders and claimants.

20.     Over the course of several years (as further described below), the Defendants have engaged in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

21.     Defendants have intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops which refuse to comply with either fixed prices or use of substandard or improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses, exerted economic duress and coercion upon both the Plaintiffs to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage  if consumers persist in their efforts to patronize Plaintiffs' businesses.

22.     Defendants' actions have caused a complete eradication of competition within the body shop industry.

23.     Defendants' actions violate federal and state law and have substantially harmed Plaintiffs.

<u>Defendants' Market Share within the Market Area of the State of Pennsylvania</u>

24.     According to the information reported to the National Association of Insurance

Commissioners, as of December 31, 2012, the named Defendants hold **over seventy-five percent (75%)** of the private passenger auto insurance market in the market area of the State of Pennsylvania.  See 2013 National Association of Insurance Commissioners Private Passenger Auto market share report attached hereto as Exhibit "1."

25.     Market shares of reported respective Defendants are:

| | | |
|---|---|---|
| • | State Farm Group | 19.02% |
| • | Allstate Group | 12.07% |
| • | Berkshire Hathaway Group (GEICO) | 6.05% |
| • | United Services Automobile Group (USAA) | 2.67% |
| • | Progressive Group | 8.39% |
| • | Nationwide Group | 11.22% |
| • | Zurich Insurance Group (Farmers) | 1.84% |
| • | Liberty Mutual Group | 5.82% |
| • | Travelers Group | 4.61% |
| • | State Auto | 0.25% |
| • | Metropolitan Group (MetLife) | 0.54% |
| • | Hartford Group | 1.41% |
| • | Donegal Mutual Insurance Company | 1.32% |
| • | Kemper Independence Insurance Company | 0.35% |
| • | Horace Mann | 0.18% |
| • | CAA Mid Atlantic Insurance Company | 0.19% |
| • | Pennsylvania National Mutual Casualty Insurance Company | 0.92% |
| • | State Auto Group | 0.24% |

26.     State Farm's market share translates into over $813,000,000.00 in earned premiums from Pennsylvania consumers.  GEICO's 6.55% share of the Pennsylvania market earns it over $253,000.000.00.  Horace Mann, the defendant with the smallest market share at 0.18%, earns premiums of over $7,700,000.00.  See Exhibit "1."

27.     Collectively the named defendants pocket more than $1,000,000,000.00 from Pennsylvania consumers each year.  A significant portion of this money is profit.  As shown by Exhibit "1," State Farm's direct loss to earned premium ratio, including defense and cost

containment expenses, is 49.83.  These loss and cost expenses include not only payment of claims but also overhead, such as office rent, salaries and similar costs of doing business. Translated, the ratio shows a gross profit margin of over forty five percent (45%).  The Liberty Mutual Group performed even better, with a gross profit margin of forty eight percent (48%). See Exhibit "1."

28.     Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs. See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

29.     State Farm holds the substantial majority market share, not merely within the State of Pennsylvania (see Exhibit "1") but nationally.  As of the end of 2014, State Farm held 18.68% of the national private passenger market in the United States collecting earned premiums of over $35 billion.  The next closest competitor, GEICO, holds a market share of slightly more than half that of State Farm.  See National Association of Insurance Commissioners 2014 Total Private Passenger Auto market share report attached hereto as Exhibit "2."

30.     State Farm thus stands as the company with the greatest power to exert substantial influence and control over the greatest number of consumers for auto repairs within the United States.

<u>Body Shop Cost and Revenue Structure</u>

31.     Body shops have several sources of cost and revenue: labor, parts, paint and materials, mechanical, electrical and administration.  Each of these categories often include subcategories with variable costs.

A.     Labor

32.     Collision repair involves several stages, each of which involves different activities and processes: body labor, painting and refinishing.  Ordinarily, each of these labor stages have individual labor rates.  For instance, posted labor rates for Plaintiff Professionals Auto Body include body labor at $78.00 per hour, refinish labor at $78.00 per hour and paint and materials at $40.00 per hour.

A.1.     Body Labor

33.     Body Labor is the repair process wherein damage to the body of the vehicle is repaired, either by replacing a damaged part or mending it.

34.     Within body labor, there are different rates which vary with the material of which a vehicle is constructed.  Fiberglass composites and aluminum are more difficult to repair than steel, require additional, specialized equipment and different skill sets of its technicians. Therefore repairs on vehicles made of fiberglass composites (such as Corvettes) or aluminum body panels (such as Buick LeSabre, BMW Z8 and 7 Series and Nissan Altima) have higher hourly labor rates. Plaintiff Professionals Auto Body aluminum repair rate is $78.00 per hour.

35.     Another aspect of labor is frame/unibody repair.  In order to repair the frame/unibody of a vehicle, the vehicle must be stabilized on a dedicated frame machine so as not to further damage the frame/unibody, measured (usually by a laser measuring tool or other computerized optic or manual measuring tool) to determine both where the frame/unibody is damaged and how much damage has been sustained. The frame is then slowly pulled via hydraulic towers to reverse the incurred damage.  This process must be done at a deliberate pace as a rushed frame pull may cause further damage or destroy the frame altogether.  Plaintiff Professionals Auto Body frame repair rate is $78.00.

7

A.2.    Refinish

36.    Refinishing includes the processes necessary to complete repairs and smooth the repaired or replaced body surfaces once the body repair has been completed in preparation for painting.   Common refinishing processes include application of primer, sealer (a barrier coat between the bare material and paint necessary to prevent negative reaction with the paint), base coat, and, depending upon the finish of the vehicle, an additional mid-coat.  Refinishing also includes the mixing of the liquid component colors to match and blend with the undamaged paint on the vehicle.

37.    Refinish labor rates are usually equal to body labor rates (see above).

A.3.    Paint and Materials

38.    Painting a vehicle is, in many ways, a process which does not require explanation. However, application of paint to a vehicle is not a one-step process.  Paint is usually applied in a paint booth, a self-contained controlled environment, separate from the repair areas of a shop. The booth must have a clean air intake filtering system to filter and reduce contaminants entering the booth, and an outgoing filtering system to reduce the contaminants released into the atmosphere.[1]

39.    Prior to painting, the vehicle must be washed.  the undamaged portions of the vehicle must be covered (or "masked") and taped off to avoid over-spray, including tires and wheel wells.  Once the painting has been completed,  a clear coat is applied and the vehicle left to dry.

40.    The process from repair to refinish to paint is usually not linear.  Most repairs

_____

[1]The Environmental Protection Agency has regulations for hazardous material emissions with which shops are required to comply.  Shops must also comply with hazardous material disposal requirements.

require several refinishing processes and paint processes at various points in the repair.  For

example, replacing a bumper.  The bumper must be sanded, primed and the inside of the bumper

painted to match the vehicle before it is bolted onto the vehicle and the vehicle is returned to the

refinish and paint processes to complete the repair.  Depending on the nature of the repair made

and its location on a vehicle, a repair may require several refinish and paint procedures

interspersed with repair procedures before completion.

     41.     Additionally, it is not only the damaged portion of a car which must be addressed.

In order to avoid clashing paint at the point where the repaired portion meets the undamaged

portion, the undamaged portion must be sanded  and the paint blended into the existing color to

create a seamless transition between original paint and new paint.

     42.     Because it is not possible, even in the controlled environment of a paint booth, to

completely remove all dust and contaminants from a vehicle that has been on the open roads

(particularly the undercarriage), the air pressure of the paint process causes some amount of dust

and small contaminants to become airborne and settle in the paint.  When the paint dries, these

contaminants cause an uneven surface in the paint.  An additional refinish process must be

completed to smooth out the imperfections.  While there is some regional variation in the name,

this process is generally recognized as de-nibbing and finessing.  Without this process, the

finished product would not return the vehicle to its pre-loss condition.

     43.     Traditionally, paint labor rates have included material costs, calculated as a

percentage of refinish hours for a given repair, and expressed as an hourly rate based upon a

standard repair.  However, in many instances, this method does not compensate the shop for the

actual costs of labor and materials and result in the shop working at a loss.  For instance,

pearlized finishes on vehicles require multiple steps, different paints and finishes to be applied in

several stages and the job takes far longer and requires more labor than a one-step coat of white paint.

44.    Other times, vehicles have unique colors that require both special-order paints and mixing to achieve the desired result to blend with the undamaged portion of the vehicle. Ferrari red, for example, is a unique color with high color saturation and brightness, and can only be achieved by mixing several different tints, thus requiring a shop t purchase different paint colors for a single job.

45.    Because of this variability, which has become more frequent in recent years, the traditional method has not kept pace with the actual costs of completing repairs.  Many shops, though not all, have begun using a paint and material calculator, or PMC.  A PMC is a computer program which calculates the cost of the paint and materials actually used in a particular repair. Actual costs are pre-programmed to account for the costs of specific materials (i.e., Sikkens brand of paint versus Axalta brand of paint).  A shop can load the type of repairs completed and the program calculates the amount and cost of the materials used, produce an invoice and this becomes part of the final bill along with the paint labor costs.

46.    However, the majority of Defendants refuse to pay PMC invoices, though they are highly exact in calculating actual costs for paint and materials as PMC invoices ordinarily result in higher totals due from Defendants.

B.    Parts

47.    Parts constitute a significant expense for shops.  There are three types of parts generally recognized in the body shop industry: Original equipment manufacturer parts ("OEM" parts) are new parts manufactured by the same manufacturer as the vehicle.  OEM parts are specifically designed to fit specific cars.

48.     Aftermarket parts are new parts manufactured by a company other than the original equipment manufacturer.  These are frequently referred to as imitation or counterfeit parts.

49.     Salvage parts are parts stripped from previously wrecked vehicles.  Salvage parts are often referred to as "recycled parts" or "reconditioned parts" by insurance companies.

50.     Body shops do not keep a supply of all parts on hand.  Parts are ordered as needed.

51.     With very occasional exceptions, Defendant insurers write estimates requiring use of aftermarket or salvage parts.  Aftermarket and salvage parts are, ostensibly, less expensive than OEM parts and, at least according to Defendant insurers, of equal quality to OEM parts. This is simply not true, as discussed below.

52.     Some insurers, such as State Farm, require use of an online parts procurement program called PartsTrader by its preferred shops.  PartsTrader is a subscription online vendor market place.  In theory, a subscribing shop can go onto the PartsTrader web site, input the part required and will receive bids from vendors who have the part available for sale and from these bids, the shop may select the proper part at a competitive price or, if a quality part is not available, may purchase the part elsewhere.

53.     In reality, State Farm requires compulsory use of PartsTrader for its direct repair facilities (see below).  A shop is not permitted to select the proper part or shop elsewhere if a quality part is not available through PartsTrader.  State Farm requires the purchase of the cheapest part available, even if it is not of like kind or quality, originates from a source of questionable or unknown provenance or even is known to be manufactured of poor quality.

54.     If a shop refuses to purchase such parts, but opts for a higher quality, safer part,

11

the Defendant insurers, particularly but not exclusively State Farm, will pay only the amount for which the part could have been purchased, regardless of its quality or fit or lack thereof.

55.     With respect to State Farm in particular, this practice benefits it in two direct fashions.  First, it immediately reduces the amount it must pay out in repair costs.  Second, State Farm is a primary investor in PartsTrader.  It underwrote the cost of developing the program and has a contract with the ostensibly independent company for repayment of this investment as well as a portion of the profits going forward.

56.     With respect to the other Defendants, they benefit also by insisting on use of aftermarket or salvage parts as a means of reducing claims payments.  In many instances, a Defendant insurer will order the parts independently and ship them to the body shop or directly specify a part and vendor from which a purchase must be made, again, regardless of quality, kind or fit.

57.     Professional repairers on the whole prefer and recommend use of OEM parts for both safety and quality reasons.  Aftermarket parts, while new, are generally inferior.  There are no federal safety requirements for aftermarket crash parts.  They are not subject to official testing for crash worthiness, fit, form or function.  Aftermarket parts are often made of thinner materials, or multiple pieces spot-welded together instead of a single piece, which directly affects a vehicle's safety performance in a crash.  Because they are not subject to federal safety testing, aftermarket parts are not guaranteed to perform as OEM parts.

58.     For instance, in a front-end crash, the bumper plays a critical role in deployment of a vehicle's air bags.  The bumper is the first structure to absorb impact, creating a series of vibrations which then alert air bag sensors to the possible need to deploy and how fast they need to deploy.  Often being made of different, thinner, cheaper materials, assembled of

12

noncontiguous sections, aftermarket bumpers do not vibrate in the same manner as OEM

bumpers, if they vibrate at all, and can result in failure of the air bag system.

59.     Vehicle hoods are also designed to crumple in a particular manner so as to absorb

and distribute impact energy to protect people within the passenger compartment.  Aftermarket

hoods, again made of thinner, cheaper material, do not crumple in the same manner OEM parts

are designed and tested to perform, thereby endangering people within the vehicle.

60.     Even aftermarket windshield glass poses a safety risk to vehicle occupants.  In a

rollover crash, the windshield works to keep the vehicle roof from collapsing.  Aftermarket glass

is thinner than OEM glass, and is not designed to fit a particular vehicle.   As with other

aftermarket parts, replacement glass is not subject to crash testing requirements, thinner glass

may shatter rather than providing protection in a rollover or may simply pop out altogether.

61.     The majority of the time, aftermarket parts simply do not fit properly.  A study

conducted by the California Department of Consumer Affairs, Bureau of Automotive Repair

found that four of five non-OEM crash parts tested were inferior to OEM parts.  Non-OEM parts

must be modified to fit a vehicle they were supposed to fit without modification, resulting in

additional labor time, the cost of which, in addition to the cost of the part itself, actually make

the non-OEM part more expensive than the OEM part.  See copy of California Bureau of

Automotive Repair *Repair Reporter*, Summer/Fall 2003 excerpt attached hereto as Exhibit "3."

62.     However, in the vast majority of instances, Defendant insurers refuse to pay the

additional labor time to modify non-OEM parts they themselves insisted on using, calling it "the

cost of doing business."

63.     Additionally, use of aftermarket or salvage parts significantly impact a vehicle's

manufacturer warranty.  While federal law prohibits manufacturers from outright voiding the

13

entirety of a vehicle's warranty due to use of aftermarket or salvaged parts, if failure of an aftermarket or salvage part causes damages to a vehicle part which is still under warranty, the warranty coverage on the damaged part is voided and the manufacturer owes no repairs to the consumer.[2]

64.     For example, if the use of a defective aftermarket or salvaged radiator support causes damage to a vehicle's engine, the damaged engine will no longer be covered under the vehicle's warranty.

65.     However, when this is brought to the attention of insurers, insurers deny any impact upon a vehicle's warranty due to the use of aftermarket or salvaged parts.  Consumers are not advised of the limitations to their manufacturer warranty.  See, for example, USAA's Quality Replacement Parts Program brochure excerpt of FAQs, attached hereto as Exhibit "4."

66.     Insurers repeatedly and falsely state to consumers that aftermarket and salvage parts do not affect a vehicle's warranty.  This falsehood is repeated in writing, not only by omission, as in USAA's brochure, above, but affirmatively, notably by the Insurance Information Institute ("III") which has published, "Generic crash parts do not interfere with a vehicle's existing warranty and are often manufactured by the same supplier and in the same manner as OEM parts."

67.     Defendants State Farm, Allstate, Erie, GEICO, Nationwide, Liberty Mutual, USAA, Travelers, Hartford, State Auto, Farmers, Horace Mann and MetLife are all member companies of the Insurance Information Institute.[3]

---

[2]See Federal Trade Commission notice,
http://www.consumer.ftc.gov/articles/0138-auto-warranties-routine-maintenance

[3]http://www.iii.org/services/directory/company-categories/insurance-companies-iii-members

68.     The Board of Directors of the Insurance Information Institution is made up of insurance company executives.  Current and former members of the board of directors include executives of State Farm, Allstate Farmers, GEICO, Hartford, Liberty Mutual, Nationwide, State Auto, Travelers, USAA and Erie. [4]

C.      Mechanical

69.     Often, collision repair involves not only damage to the body of the vehicle but also to mechanical parts such as the engine.  In order to complete the repair, mechanical repairs are necessary.

70.     Some shops have mechanical repair specialists on premises.  When they do, a separate hourly rate applies to work performed by mechanics.  For instance, Plaintiff Professionals Auto Body  performs mechanical work at the rate of $ 78.00 per hour.

71.     Shops which do not perform mechanical work in house sublet the job to an outside source.  The cost of repair includes the actual cost of the mechanical repairs plus a "mark up" ranging between twenty five and thirty five percent (25-35%) of the mechanical bill to cover the cost of transporting the vehicle to and from the sublet location.  The mark up covers not merely the actual costs of transportation, such as gasoline or a tow truck when needed, but also the cost of the employee who must transport the vehicle and be diverted from in-house duties.

D.      Administrative Costs

72.     Administrative costs are those fees assessed for necessary non-repair work. Almost exclusively, non-repair administrative work are tasks compelled by  insurers.  Insurers often require numerous photographs be taken and transmitted electronically before approval for

---

[4]Multiple Defendants named in companion cases have also served or presently serve as members of the board of directors of III including AIG, Erie Insurance, Hanover, American Family, and Westfield Insurance.

work will be given but Defendant insurers refuse to pay for these tasks.

73.     Additionally, the use of junkyard or imitation parts results in lost time and expense to the Plaintiffs.  Parts which do not fit may be returned to the vendor but such returns require the Plaintiffs to pay a restocking fee, which is not reimbursed to the shop.

74.     Above restocking fees, parts must be received and inspected.  As most aftermarket and salvage parts required by the Defendant insurers are inappropriate, broken or of poor quality, they must be repackaged and returned to the seller, and new parts ordered, utilizing employee time, resources and expenditure of funds which would not be required but for the Defendant insurers stipulations.

75.     Administrative fees vary from shop to shop.  Some bill by flat fee, others by task. But again, Defendants refuse to pay these charges though the tasks are almost exclusively compelled by the Defendants under threat of refusing to pay for repairs.

ROLE OF DIRECT REPAIR PROGRAMS

76.     At their initiation, direct repair programs ("DRPs") were apparently intended to benefit consumers by ensuring a pre-screened pool of reputable, quality body shops existed to which customers and claimants could be referred.  Allstate is generally believed to have been at the forefront of the DRP initiative in the 1970s.

77.     In addition to Allstate, the vast majority of major insurers created DRPs over the years, including State Farm, GEICO, USAA, Progressive, Nationwide, Farmers, Liberty Mutual, Travelers, MetLife, Hartford, Erie and State Auto among others.

78.     Over the course of intervening years, the emphasis of DRPs completely shifted course and direction. Defendant insurers tout their programs publicly as beneficial, time-saving and cost-saving for consumers:  One-stop shopping for collision repairs–going to a DRP shop, a

16

consumer can take care of their claim needs, rental car needs and collision repair needs in one neat package.

79.     This continues to be the public face of direct repair programs.  The reality, however, is starkly contrary.  Instead of ensuring quality repairs, DRPs became vehicles for suppressing repair costs to the detriment of the Plaintiffs and consumers.  Insurers steer or coerce consumers to their DRP shops, again proclaiming their benefits, while knowing many DRP shops across the nation consistently and willfully fail to make safe and proper repairs.

80.     DRPs are not in and of themselves a problem.  It is the use to which State Farm, Allstate, GEICO, USAA, Progressive, Nationwide, Farmers, Liberty Mutual, Travelers, Country, Auto Owners, Safeway, MetLife, Hartford, First Acceptance, ACCC and State Auto have put them, primarily over the last ten to fifteen years, which have created a national atmosphere where one industry–insurers–control and direct the entire business of a wholly separate industry–auto body collision repair shops.

81.     DRPs were originally presented to body shops generally as a mutually beneficial opportunity. In exchange for providing a "most favored nation" ("MFN") pricing clause, as well as preferential timing of repairs, the individual Defendants would list the body shop as a preferred provider.  This, though, was never an official part of DRP association, no actual agreement for insurers to perform anything beneficial for any shop was ever made.

82.     Over the course of years, the concessions demanded by State Farm, GEICO, USAA, Progressive, Nationwide, Farmers, Liberty Mutual, Travelers, MetLife, Hartford, and State Auto increased incrementally until, in the present day, insurers exert complete control over every aspect of a body shop's business.  These actions include but are not limited to, exerting economic and market coercion to establish a "market rate" or "prevailing competitive price"

17

labor rate established by insurers rather than competitive forces between body shops.

83.     At present, the Defendants require a shop to not only accept fixed prices on labor, fixed prices on paint and materials, fixed pricing procedures on parts, refusal to compensate or fully compensate for processes and procedures, but many compel the shop to include the DRP sponsor as an additional insured on the shop's liability insurance (even though the sponsor holds no lien or other ownership interest), compel indemnification for liability assessed to the sponsoring insurer, compel primary assumption of liability for repairs using parts provided by or insisted upon by the sponsoring insurer, compel mandatory production of the shop's financial information and books upon demand, and authority to obtain background checks upon the shop's employees at the sponsoring insurer's will and pleasure.

84.     Some terms of DRP agreements are consistently disregarded by the sponsoring insurer when it is in their immediate financial interest.  For example, State Farm's Select Service DRP requires use of certified parts for crash-related parts such as bumper assembly and radiator supports.  However, State Farm regularly and routinely writes estimates including, and will only pay for, salvaged crash-related parts of unknown provenance and without any indicia of soundness or crash worthiness.

85.     Within the last several weeks, State Farm has begun circulating a new Select Service document which includes a term permitting State Farm to disregard any term it chooses, including the use of certified crash-related parts, without any consequences to State Farm.  The new Select Service document also requires shops to relinquish all legal rights and recourse against State Farm for all claims related to parts selected for use by State Farm and requires shops to assume all liability for all repairs, including liability resulting from use of State-Farm-mandated parts.

86.     Failure to comply with DRP terms results in a pattern of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses.  Failure to comply with any express term or failure to comply with a self-selected avoidance of a term by the sponsoring insurer (such as described immediately above) results in  either removal from the program(s) combined with improper "steering" of customers away from the Plaintiffs' businesses, or simply punishment to decrease the number of customers utilizing the Plaintiffs services, and/or increasing ongoing and improper refusals to pay for certain repair procedures and/or charges without valid or reasonable justification.

87.     DRP agreements are not enforceable contracts.  They do not contain essential legal elements of an enforceable contract, most notably consideration as DRPs promise no performance of anything by the sponsoring insurer and offer nothing of value to a body shop.  All purported benefits and concessions flow from a body shop to the sponsoring insurer which undertakes no obligations of any kind in return.

88.     Nor do sponsoring insurers treat them as enforceable contracts.  No insurer has ever sought legal redress for alleged breaches of a DRP, sponsoring insurers regularly disregard terms as they see fit when it benefits them (see above) and interpreting "most favored nation" clauses to mean labor rates and other compensation may be set by the insurance industry through combination or conspiracy rather than the ordinary definition given that term, which is the shop will provide to the DRP sponsor the best rates made available to other customers.  The insurer's interpretation results in the tail wagging the dog.

89.     Plaintiffs do not allege any contract exists between themselves and any Defendant, individually or as a group.  If any Defendant wishes to assert the existence of a valid contract between itself and any or all Plaintiffs, they are free to do so.  However, applicable

19

authority requires any Defendant who wishes to do so plead the existence of an express contract

in their respective Answer(s) as an affirmative defense and any Defendant who so asserts bears

the legal burden of proof of same, including the legal enforceability of such under the laws of the

State of Pennsylvania.

### Non-DRP Shops and Defendant Insurers Without DRPs

90.     Whether or not an insurer sponsors a formal direct repair program has no effect

on the behavior of the named Defendants, nor does any Plaintiffs' association with any DRP.

The Defendants collectively and through exertion of their combined market share power, enforce

against non-DRP Plaintiffs, non-compliant DRP Plaintiffs and other body shops as many DRP

"concessions" as they possibly can, either explicitly or by de facto substitute.

91.     Defendants who are not known to have formal DRPs at this time also enforce

many DRP terms against the Plaintiffs, including but not limited to a "most favored nation"

interpretation.

92.     Borrowing the concept of a "most favored nation" clause while turning it on its

head, the Defendants compel acceptance of a fixed pricing structure by asserting they, as a group

and with the power of a group, have the ability to set the rates the Plaintiffs are permitted to

charge for their services.  The details of the price fixing structure are set out below.

93.     No law or other authority has ever been identified which permits the Defendants

to set the pricing structure of the collision repair industry, nor compel them to purchase certain

parts or materials, nor determine the work which constitutes a full and safe repair.  Yet that is

precisely what the Defendant insurers have done, simply by imposing their collective will upon

the body shop industry, and exploiting every possible financial vulnerability.

94.     The Defendants assert they are merely paying the "market rate" or "prevailing

rate." However, this is a misrepresentation. "Market rate" and "prevailing rate" or "prevailing competitive rate" are terms used to describe a median or average of rates in a particular industry as they ebb and flow over both time and geography, react to market influences, innovations and advances in the field, and competition between practitioners of that trade or profession.

95.     In other words, in any other industry, an MFN or "market rate" discussion would assume the existence of a free market. Gas stations compete with each other, introducing new products they hope will appeal to the public, raising and lowering their prices, sometimes with astonishing speed, based upon the competitions' published prices, market availability of an increasingly scarce resource, government regulation and world events. A trucking company entering into an MFN agreement with a gas station would require the best price that gas station makes available to any other customer.

96.     It would be wholly inconsistent with accepted principles of a free market, the law and business term interpretation if that company decided that instead of demanding the best price available from the gas station, it banded together with nearly every other trucking company to exploit the gas stations' need for gasoline to be delivered by the trucking companies and arbitrarily decided what gas should cost for themselves. And not just at a single gas station but at every gas station in America.

97.     That is precisely what has occurred in the body shop industry, aided by the formatting of DRPs and the enormous economic power the Defendants collectively hold.

98.     The Defendants, as a concerted and agreed upon action, compel non-DRP body shops to agree to parts discounts the insurers have independently contracted with parts suppliers as required in DRP agreements.

99.     The Defendants, as a concerted and agreed upon action, simply refuse to pay

21

more for parts than the cheapest a part can be purchased.  This is so whether or not the part is

safe, appropriate, of like kind or quality, or even available.

100.     The Defendants compel the Plaintiffs to assume indemnification of them for

liability arising out of repair procedures dictated by the Defendants, or parts purchases dictated

by the Defendants, or product defects from the materials the Defendants dictate must be used.

101.     The Defendants, as a concerted and agreed upon action, impose fixed prices upon

the services performed by the Plaintiffs to the Defendants' insureds and claimants.

102.     In reality, the Plaintiffs have no option but to do business with consumers for

whom the named Defendants are responsible for paying for repairs.  As noted, State Farm,

Allstate, GEICO, USAA, Progressive, Nationwide, Farmers, Liberty Mutual, Travelers, MetLife,

Hartford, and State Auto control over seventy percent (70%) of the private passenger insurance

market within the State of Louisiana.  Refusing to do business with State Farm, Allstate, GEICO,

USAA, Progressive, Nationwide, Farmers, Liberty Mutual, Travelers, MetLife, Hartford, State

Auto insureds and claimants excludes more than three-quarters of the population of potential

customers within the state, a situation not feasible for a shop that wishes to stay in business.

There is no meaningful option.

103.     Nor is there any meaningful opportunity to negotiate.  Payment is presented to

Plaintiffs on a "take it or leave it" basis.  Attempts to obtain better terms results in not only

refusal, but threats of pecuniary harm, retaliation, boycotting, and coercion.  See additional facts

below.

104.     Whether or not a Plaintiff is associated with any DRPs does not alter this.

105.     Plaintiff Juniper Auto Body, Inc., was associated with ANPAC and USAA until

July and August, 2014, respectively.  Plaintiff disassociated from the DRPs of Erie, Infinity,

State Farm and Liberty Mutual in 2012.  Juniper has not associated with any other DRPs since 2012.

106.     Plaintiff L.I.P. Collision, Inc., participated in the State Farm Select Service Program from 1997-2014.  Plaintiff disassociated from DRP due to increased pressure to use LKQ suspension, increased pressure to offer State Farm discounts to stay "competitive" in our "market area" and the introduction of the Parts Trader program.  Plaintiff L.I.P. was also a member of the Harleysville Insurance DRP from 1996 through 2013.  Plaintiff was a part of the direct repair program for Harleysville Insurance until they were acquired by Nationwide Insurance at which point Nationwide ended all of the Harleysville direct repair contracts.

107.     Plaintiff Total Performance Automotive, LLC is not associated with any DRPs.  Total was previously associated with State Farm's DRP until December of 2010, and Progressive until March of 2015.  Total was also a member of the Harleysville Insurance DRP until they were acquired by Nationwide Insurance at which point Nationwide ended all of the Harleysville direct repair contracts.

108.     Plaintiff Professionals Auto Body has throughout the years has been a member of many DRPs including Erie, Allstate, State Farm, Harleysville, Metropolitan.  Professionals has not associated with any DRPs since 2012.

109.     Plaintiff Nigro's Auto Body, Inc., has not associated with any DRPs since October of 2010.

110.     Plaintiff Opeka Auto Repair Co., Inc., is not associated with DRPs.  Opeka was previously associated with Liberty Mutual DRP until December of 2013, and Progressive until March of 2015.

111.     Plaintiff Kilkeary's Auto Body, Inc., has not associated with any DRPs since

October of 2010.

112.    Plaintiff Hayes Auto Body, Inc., previously participated in DRPs with MMG Ins., Goodville Ins., and Erie and disassociated with each of them in October 2014.

113.    The actions described above are in violation of state and federal law.

## CONTROL OF THE REPAIR PROCESS

114.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

115.    Insurance companies are not body shops. They sell insurance. Body shops are not insurance companies. They repair damaged vehicles. The body shop industry does not compete with the insurance industry, nor vice versa.

116.    The Defendant insurers have officiously interjected themselves into every step and aspect of automobile collision repairs.  Although Plaintiffs' agreement to effect repairs is with the individual consumers, the Defendants require Plaintiffs to wait to begin repairs until after an agent of the responsible insurer has inspected the damaged vehicle upon threat of refusal to pay for necessary repairs or the insurer has issued its own estimate, with or without an in-person inspection.

117.    All estimates prepared by the agent of all Defendants include the statement that the estimate is not an authorization to repair and supplements will not be honored without the insurer's prior approval, though repair approval is a right which belongs to consumers, not the repairer.

118.    State Farm has even told consumers a body shop has "no right" to establish the

24

extent of repairs needed on a vehicle.

119.   When hidden damage not apparent at the first inspection is discovered, all

Defendants require all Plaintiffs to either wait for an agent to return to inspect the vehicle or take

pictures of the additional damage and gain approval from the responsible insurer Defendant

before fixing said damage, upon threat of refusal to pay for necessary repairs, even when the

vehicle owner has already authorized repairs.  This requirement is written into each Defendant

insurers' estimates.

120.   Although the choice of type of repair parts (OEM, aftermarket or salvage)

belongs to the consumer, the Defendants require Plaintiffs to accede to their respective  written

estimates specifying salvaged or aftermarket parts, even when such contradict the express

direction of the vehicle owner, contradict the vehicle manufacturer recommendations or even

impairs the vehicle warranty.

121.   Each Plaintiff has been informed of this "policy" by at least one representative or

agent of each Defendant and will testify based upon personal knowledge.

122.   The Defendants compel or attempt to compel use of particular vendors for parts

procurement.  Failure to comply with this requirement, even when compliance is not actually

possible, i.e, the specified vendor does not have a particular part available, results in refusal to

pay for the part actually used for the repair in full.

123.   Each Plaintiff has been informed of the "required" vendor by at least one

representative or agent of each Defendant and will testify based upon personal knowledge.

124.   The Defendants limit the processes and procedures used in a given repair, even

when the collision repair professional asserts a professional opinion which conflicts with the

insurer representative, who is not a collision repair professional.  Frequently, an insurer

representative will agree the process or procedure is necessary for a full and safe repair but refuses compensation because "we just don't pay for that." See below for additional facts.

## PRICE FIXING

125.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

### A.    Labor Rates

126.    The Defendants all assert they will pay no more than the market rate for labor in the market area.

127.    However, only one company, State Farm, conducts any sort of inquiry into body shop rates, what it terms its "surveys" to purportedly determine a labor market rate in a market area.  This survey is described below.

128.    None of the other Defendants conduct any form of body shop-industry labor rate studies.[5]

---

[5]Since the inception and as a result of this litigation, one or two Defendants appear to have made an effort at conducting some form of survey.  However, these purported surveys have not had any discernable effect on the Defendants' group behavior.

26

1.      State Farm's "Market Rate" Setting Method

129.    State Farm conducts its purported survey by asking shops to fill in their individual rates for body labor, refinish labor, paint, and so forth, via an online site, State Farm's Business2Business portal, or B2B.

130.    However, State Farm does not merely collect the information provided and perform statistical or arithmetic calculations.  Upon receipt of rates it unilaterally deems too high, State Farm will either contact the shop and order it to amend the survey response to a lower number it finds acceptable or it will unilaterally alter a shop's information without the knowledge or consent of the shop involved.

131.    Most often, though not exclusively, State Farm's orders to reduce or unilateral reduction of rates occurs with larger shops or independent shops which operate more than one location.  The reason for this is described below.

132.    When State Farm selects the first option as an initial action, the order to reduce the rates entered on the B2B portal are accompanied by threats of removal from the DRP and/or promises to steer business away from the non-compliant shop.  For example, State Farm representative , Bob Brass told Plaintiff L.I.P. Collision that they were the only body shop in the area using a material rate calculator and that he should switch his survey response to a dollar figure based upon paint labor hours, otherwise, he was wasting his survey response for material reimbursement.

133.    Once the information has been altered to State Farm's satisfaction (whether by a shop under duress or unilaterally without the shop's knowledge), it then performs its "half plus one" form of math.  State Farm lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and  the least expensive hourly rates at the

bottom.

134.    This manipulation is not limited to Pennsylvania but represents a corporate policy enacted and enforced across the nation.  In Tennessee, State Farm has repeatedly directed Plaintiffs AAA Collision and AAA Collision-Oakland[6] to reduce their rates because they did not conform with State Farm's "market rate."

135.    In Washington, State Farm created a completely false survey entry of rates for Washington Plaintiff Haury's Lake City Collision[7] in 2013/14.  Haury's did not complete a survey and had not done so since it left State Farm's DRP nearly a decade earlier.  When confronted with this false entry, State Farm stated the information had been provided by an employee of Haury's.  However, Haury's does not have an hourly labor rate; it bills by the job, in the same manner as attorneys who bill by flat fee rather than hourly rate.  No Haury's employee could have provided an hourly rate because no such rate exists.

136.    Additionally, in prior litigation, documents produced in discovery established State Farm altered shop rates entered into the B2B portal.  See copy of *Dealer's Edge* article, published July 15, 2011, attached hereto as Exhibit "5."

137.    State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  State Farm then totals the number of technicians or work bays and employs its "half plus one" math.  As an example, if the total number of technicians/work bays for a given area as determined by State Farm equals fifty, State Farm's magic number would be twenty-six (half fifty plus one).

---

[6]AAA Collision and AAA Collision-Oakland are Plaintiffs in the companion case of *Brewer Body Shop, et al v. State Farm Mutual Auto. Ins. Co., et al*, Cause No. 6:14-6002, also pending before this Court.

[7]Haury's Lake City Collision is a Plaintiff in the companion case *Haury's Auto Body, et al v. State Farm Mutual Auto. Ins. Co., et al*, Cause No. 6:14-cv-6015, also pending before this Court.

138.    Beginning at the bottom of the list with the cheapest shops, State Farm then counts the number of technicians/work bays up the list until it reaches its magic number.  The rates of whichever shop this happens to fall upon is declared the "market" or "going rate."

139.    The problems with this methodology are numerous.  The rates themselves are artificially created by State Farm at the very beginning of the process.  The math does not represent any identifiable form of professionally accepted methodology, even if the numbers used in that process reflected the actual labor rates rather than the rates State Farm self selects.

140.    The method contains a built in bias towards the rates of larger shops or shops with more than one location such as multi-shop operators ("MSOs" or "chains" such as Service King, ABRA, Sterling or Caliber, all of whom are direct repair shops for multiple named Defendants) as such facilities have greater capacity, more work bays and more technicians.  As the number of work bays or technicians determines State Farm's "half plus one" results, it becomes imperative for larger shops' labor rates to conform to State Farm's predetermined outcome, which State Farm ensures they do.

141.    Additionally, the method makes no provisions for work quality, equipment, quality of personnel or any other factor.  State Farm's method does not provide a range of going rates, it produces only one.  Therefore the worst shop in State Farm's determined market area is paid exactly the same as the best shop, including direct repair shops well known to provide poor, incomplete and unsafe repairs.

142.    Finally, a State Farm employee has admitted to Plaintiffs the "market rate" is fabricated, that State Farm deliberately suppresses labor rates and the purported survey results in a "prevailing competitive price" is actually "whatever State Farm wants it to be."  This employee has further admitted State Farm purposefully asserts reliance upon out-of-date information, such

29

as labor rates "about twenty years old," entered into the "survey" long ago.

2.    Collusion by Defendants with State Farm

a.    Collusion in Labor Rate Price Fixing

143.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually..

144.    State Farm does not publish or otherwise make publicly available its "survey" results. State Farm has, in fact, made significant efforts to keep this and other internal information out of the eye of the general public, particularly consumers and the media.

145.    State Farm does not disclose or make publicly available the geographic area it determines constitutes a given "market area."

146.    State Farm can and does alter a given "market area" to further manipulate the results or to punish a particularly noncompliant shop by including it in a different market area with lower rates.    State Farm does not even disclose to its claims team leaders the criteria for determining a "market area" or the criteria for changing a "market area."

147.    Even in litigation, State Farm habitually obtains blanket protective orders for all information produced in discovery on the grounds that training manuals, policies and procedures and internal processes constitute trade secrets, proprietary information or confidential information. See, e.g., *Hover v. State Farm Mut. Auto. Ins. Co.*, 2014 U.S. Dist. LEXIS 119162 (E.D. Wa. 2014), *Akins v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011), *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003), *Hamilton v. State Farm Mut. Auto. Ins. Co.,* 204 F.R.D. 420 (S.D. Ind. 2001).

148.    Although none of the Defendants conduct an independent determination of market rates, all state they will pay no more than the "market rate."

149.    All of the Defendants' "market rate" is identical to the "market rate" established by State Farm's fabricated survey.

150.    For instance, in 2012 the posted rates for Plaintiff LIP Collision in North Wales, Pennsylvania were $70.00 per hour for body labor and refinish labor.  However, State Farm had determined the "market rate" for this area was $48.00.  All of the Defendants paid the State Farm "market rate" of $48.00 per hour for labor and refinish labor.  State Farm's "market rate," purportedly based upon surveys of the market and applied and enforced by group action by the Defendants, does not reflect the actual rates of the shop in the North Wales market.

151.    Representative or agents of each of the Defendants have stated to the Plaintiffs they could not or would not alter their "market rate" unless and until State Farm alters the "market rate," that State Farm sets the rates.

152.    These statements made to Plaintiffs are corroborated by the identical nature of the rates paid by the Defendants and their contemporaneous change in conformity with State Farm over time.

153.    Very tellingly, in Pennsylvania, a Progressive representative explained that body shops do not "affect pricing," the insurance companies get together to determine rates and new rates would probably be determined by a "big meeting" scheduled for April, 2015.

154.    This collusion is not limited to Pennsylvania.  Explicit statements made by representatives of various Defendants, including State Farm, establish the agreement by and between the Defendant insurers is national in nature, knowing and intentional.

155.    A State Farm employee in Tennessee has admitted that State Farm sets the rates

31

for the entire industry, that it "dictates the market," that State Farm stands for "controlling the market," and the other insurers follow its "lead."

156.    This same State Farm employee has admitted that State Farm deliberately suppresses labor rates and the purported survey results in a "prevailing competitive price" is actually "whatever State Farm wants it to be."  This employee has further admitted State Farm purposefully asserts reliance upon out-of-date information, such as labor rates "about twenty years old," entered into the "survey" long ago.

157.    In speaking of the Louisiana Attorney General's action against State Farm, this same State Farm employee has admitted that everything in the Complaint is true, "we do all that," "every iota is the truth . . . . when you read [the complaint], it's like, 'that's us.'"

158.    Plaintiffs note the allegations and facts set forth in the Louisiana Attorney General action, *State of Louisiana, ex rel. Caldwell vs. State Farm*, formerly Cause No. 6:14-cv-6017 are essentially identical to the facts and allegations of the present Amended Complaint.[8]

159.    In Oklahoma, USAA representative Chad Turner told a body shop that USAA's rates would probably be increasing soon because the new State Farm survey results had just been circulated.

160.    In Louisiana, Tim Boudreaux of Louisiana Farm Bureau has told Louisiana Plaintiff Advanced Collision his company will only pay what State Farm pays.

161.    In Alabama, several Allstate representatives, including but not limited to Keith Eddy, have told various shops that Allstate's "market rate" will stay the same as State Farm's and will not raise until State Farm approves an increase.

162.    Another Allstate representative Forrest Odom has specifically stated, "When

---

[8]This cause has since been remanded to Louisiana state court.

State Farm changes the rates, Allstate will change theirs.  State Farm is the big dog in this hunt."

163.     In a separate instance, when asked about increasing labor rates, Mr. Odom has further stated, "State Farm is the giant and they do a survey, we don't do a survey."

164.     Alabama GEICO representative Tarria Poplar was asked by Plaintiff Oak Mountain[9] when GEICO would begin paying the posted labor rates.  Ms. Poplar stated, "When State Farm starts paying the rate then GEICO will.  You know State Farm is the Big Brother in this business."

165.     Alabama GEICO representative Joe Ballinger and multiple representatives of USAA have also made similar statements.

166.     Non-Defendant Cincinnati Insurance[10] representative Derrick Hopkins was asked by Plaintiff  Oak Mountain why Cincinnati was sticking with the fixed labor rate of $48.00 per hour.  Mr. Hopkins expressed regret that the rate had remained unchanged for so many years and stated, "I wish State Farm would raise the rate so we can follow."  When asked why Cincinnati had to wait for State Farm, Mr. Hopkins stated, "That's just the way it is."

167.     Despite evidence of disparate rates, disparate billing methods,  in disparate population centers over time, the named Defendants have consistently acted in a united manner to illegally fix and suppress the labor rates of body shops in Illinois generally and the Plaintiffs in particular.

168.     Collusion and agreement is apparent not only in the identical "market rates" paid by the Defendants but representatives of many named Defendants have explicitly or implicitly

---

[9]Oak Mountain Body Shop, LLC, is a Plaintiff in the companion case *The Only One, Inc. v. State Farm Mutual Auto. Ins. Co.*, Cause No. 6:14-cv-6009, also pending before this Court.

[10]Cincinnati is not a named Defendant in this action, but it is a named defendant in multiple companion cases.

linked their own rates to those fixed by State Farm, and verbalized the existence of group meetings of Defendant insurers wherein labor rates are illegal fixed by the Defendant insurers. Again, this is not confined to Illinois but occurs nationwide.

        b.      Collusion in Market Area Determination

169.    As noted above, State Farm also purports to establish market rates based upon "market area." This would presumably account for variations across distance, metropolitan areas as well as discrete areas of a given state, such as Pennsylvania.

170.    Regardless of the size of the shop, the population center and demonstrable difference in rates actually charged by the Plaintiffs across the State of Pennsylvania, State Farm determined the "market rate" in Pennsylvania was $48.00 per hour (body and refinish) from at least 2011 to mid 2013.

171.    The remaining Defendant insurers also paid $48.00 per hour across the State of Pennsylvania, despite performing no survey of their own.

172.    Despite there being demonstrable differences in the rates charged at the varying locations in Illinois, the Defendants all assert the "market rate" in the "market area" was not only identical, it was identical to that of State Farm.

173.    This information could only have been provided by State Farm to its ostensible competitors. The same data a State Farm employee has admitted is manufactured to suit State Farm.

174.    The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey would be outside the realm of possibility. This is even more obvious when one considers the possibility of reaching an identical conclusion to that of State Farm when State Farm's conclusion is based upon a labor

rate State Farm manipulates and creates via a fatally flawed methodology.

    3.    Intimidation and Coercion of Plaintiff Shops Threatening Anti-Trust Allegations

175.    Over the course of years, in addition to manufacturing a "market rate," the Defendants have utilized other methods of intimidating the Plaintiffs and other body shops to suppress labor rates.

176.    Shops are frequently told they are the only shop trying to raise their rates, therefore the posted rates do not conform with "market rates" and the Defendants refuse to pay the posted rates.

177.    Representatives of the Defendant insurers have made statements about non-conforming rates to the Plaintiffs.  Plaintiffs have personal knowledge of these statements and can testify to the same.

178.    Defendants have threatened Plaintiff shops and others that if they discuss labor rates with each other, they will be price fixing and breaking the law.  Statements to this effect have been made by Defendants to the Plaintiffs and announced at meetings of the Southeastern Auto Collision Association by various representatives of the insurance industry.

179.    Plaintiffs have personal knowledge of these statements and can testify to the same.

180.    Again, this has been a national effort.  At various times, members of the Defendant insurers have threatened antitrust lawsuits.  The threats have been so frequent that the Mississippi Collision Repair Association frequently requests the attendance of a witness from the Mississippi Attorney General's office at association meetings so as to provide independent verification that no price fixing or collusion occurs at those meetings.

181.    Plaintiffs believe the forgoing facts are sufficient to establish the probability that

discovery will adduce additional information showing the Defendants have intentionally acted in concert, combination and by agreement to fix and suppress the labor rates of the body shop industry in Pennsylvania.

B.     Repair Processes and Procedures

182.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

183.    The Defendant insurers have over the course of years exerted their combined market share power to refuse payment or full payment for repair processes and procedures required to return vehicles to pre-accident condition.

184.    This failure constitutes a selective failure by Defendants to follow collision repair industry standards for auto repairs, while simultaneously relying upon these same standards when they choose.

185.    Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a)     ADP or Audatex;

b)     CCC; and

c)     Mitchell.

186.    These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repair procedures, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are

accepted within the body shop industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario" presented by the procedure databases and the actual needs of a particular repair.

187.    By default, database estimates are underestimates of actual repair times and materials.  The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, which can substantially affect real world repair procedures required, repair times and necessary materials.  It is, for instance, much faster and easier to remove an undamaged door from an undamaged vehicle than it is to remove a wrecked door from a wrecked vehicle, where removal often requires prying the damaged components apart from each other before they can be removed from the vehicle.

188.    The databases also provide standards for billing, defining what procedures are considered included operations–procedures billed "in bulk" as part and parcel of a repair–as well as defining not included operations–procedures billed separately.

189.    Historically, these procedure databases were printed and distributed in hard copy to subscribers.  Throughout the industry, they are referred to as "p-pages."

190.    Although now housed in electronic form as computer databases, they are still popularly referred to as "p-pages."

191.    The databases, or p-pages, are essentially identical in their content.  Choice as to which one will be used is generally based upon price point and personal preference.

192.    All of the Plaintiffs subscribe to one or more of these databases and use the same to generate estimates for individual repairs.

193.     All of the Defendants subscribe to one or more of these databases and use the same to generate estimates for individual repairs.  Where a purportedly independent appraiser is hired by a Defendant, rather than an employee of the Defendant, the independent appraiser uses one or more of these three databases to generate estimates for individual repairs.

194.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, either through their own consistent use of these databases or more explicitly, as State Farm has done.

195.     As much as twenty years ago, State Farm assured the body shop industry it does and would continue to abide by the standard operations of the "p-pages."  Sitting on a panel discussion at the 1994 National Autobody Congress and Exposition, State Farm speaker Gerry Westerfield answered a question of how to handle State Farm adjusters who refused to pay for standard "p-page" operations with the following:

196.     "If a State Farm representative comes to your shop and says, 'We don't pay for that, it's company policy,' take it from me, we don't have that policy.  . . .  So tell them, 'I know your policy and that's not it.  Who's your supervisor?'"

197.     Despite public endorsement and daily use  of the databases, the Defendants have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and processes.

198.     In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

199.     Alternatively, the Defendants will refuse to make full payment for processes and procedures required to return a vehicle to pre-accident condition.

200.    A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit "6."

201.    At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

202.    Representatives of the Defendants have all made verbal statements to the Plaintiffs that particular processes, procedures or billed materials will not be paid for purported failure to comply with the p-page databases.

203.    Plaintiffs have personal knowledge of these statements and will testify to the same for each Defendant named in this paragraph.

204.    Defendant insurers will alter the database estimates, unilaterally reducing either labor time or materials needed.  Manual changes to database standards are automatically marked by the program either by underlining or an asterisk so there is no question when a Defendant has altered database information.

205.    Defendant insurers' only reasons  for reducing or deleting necessary repairs on their estimates are, "We don't pay for that," or "That isn't reasonable or customary in your market area."

206.    Notably, these excuses have nothing to do with necessary repairs, whether a process, procedure or material is required to repair a vehicle to pre-accident condition, or the length of time to complete a particular repair, or even a question as to the work was actually performed and everything to do with the insurer Defendants' simple refusal to pay for full,

39

complete and safe repairs.

207.    When pressed by Plaintiffs to explain why a necessary operation will not be paid

for, representatives of the Defendants will admit the operation is required but that the Defendant

insurer requires the estimate to be written without its inclusion.

208.    Even when a shop provides information or documentation that a process or

procedure is required, either due to the manufacturer's standards for safe repairs or the

databases, the Defendant insurers refuse to authorize or pay for those processes or procedures.

209.    This is done even when the insurer publishes it will follow such guidelines,

including collision repair industry standards, manufacturer's recommendations and I-CAR[11]

recommendations, when writing repair estimates.

210.    Processes and procedures are routinely excluded by the Defendant insurers,

though when performed, they are necessary to return a vehicle to pre-accident condition by

making the false statement the excluded process or procedure is an included operation.  The

databases specifically note these procedures are not included in other repairs or refinish

procedures and thus must be billed and paid as separate items.

211.    Examples of the foregoing include the following:

•       Feather, prime and block: This procedure is a refinish operation that completes
        bodywork repair from 150 grit smoothness to the condition of a new undamaged
        panel.  While this procedure is not required on every repair, when it is performed,
        all three databases clearly state it is not an included operation and it is a refinish
        operation.

212.    The Defendant insurers generally do not dispute the necessity of feather, prime

and block when a repair calls for it.  Rather, the insurer Defendants  have historically

---

[11]I-CAR, Inter-Industry Conference on Auto Collision Repair, conducts instruction classes for repair
professionals and other industry professionals leading to certification of repairers as competent to conduct repairs in
multiple areas, such (but certainly not limited to) as aluminum repair.  I-CAR platinum certification, the highest that
is awarded, is very highly regarded.

consistently refused to pay for this procedure in its entirety to the Plaintiffs on the ground that it was an included body labor operation.

213.    However, it is not an included operation.  As noted, each of the databases utilized by the Defendant insurers state as such.

214.    In other instances, the Defendants will tell Plaintiffs each is the only one to insist on payment for necessary work performed.  The falseness of these statements is apparent as each Plaintiff has sought payment for the work performed, notified the respective Defendants and the Defendants were fully aware each was not "the only one."

- Denib and finesse (also known as color sand and buff or color sand and polish): This refinish procedure is described above. All three databases denote this procedure, when required, is <u>not</u> an included operation.

215.    Most of the Defendant insurers simply leave this procedure off their estimates and refuse to acknowledge Plaintiff supplements requesting payment for same.

216.    In other instances, Defendants will acknowledge a procedure is both necessary to return a vehicle to pre-accident condition and follows the protocols of the p-pages but simply refuses to compensate for it.  For example, Liberty Mutual briefly aired a commercial as part of its "Lifetime Repairs Guaranteed" advertising campaign discussing the importance of blending, the process ensuring the paint on repaired/replaced panels match adjacent panels.  In the commercial, an actress discusses failed paint matching following a repair then goes on to state Liberty Mutual's Lifetime Guarantee takes care of this problem.  However, this is inconsistent with Liberty Mutual's refusal to pay fully for blending, among other matching procedures, and the commercial was pulled, not only from airing on television but removed from all outlets.

217.    Plaintiffs have personal knowledge of these statements made by the Defendants' representatives or agents and are able to testify to the same.

218.   Plaintiffs assert discovery will produce information and/or documentation to establish the universe of procedures and processes the Defendants refuse to pay for, misrepresent as "included operations," and the other misrepresentations and/or false bases for refusing to pay for work performed.

3.   Paint and Materials

219.   Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

220.   As described above, traditionally, paint and materials have been compensated at an hourly rate.  Separate and apart from paint labor rates, paint and materials rates were intended to compensate shops for the cost of paint and materials used in a repair.

221.   However, as also described above, contemporary vehicle finishes and the materials necessary to complete repairs have costs which have outpaced the traditional method. While it is inarguable  materials must be expended to repair automobiles, the Defendants simply refuse to pay for them or pay fully the paint and materials costs submitted, asserting additional costs are part of the cost of doing business.  This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair operations.

222.   All of the Defendants assert the paint and material rate they pay is the "going rate" or "market rates" in the area.

223.   However, over the last few years, many Plaintiffs have begun using a PMC (described above), which provides a detailed invoice of paint and materials expended for each

repair.

224.    The Defendants, however, generally refuse to pay PMC invoices.

225.    Every single Defendant continues to estimate and pay based upon the antiquated method of an hourly rate for paint and materials.

226.    Despite there being demonstrable differences in the rates charged, the named Defendants, all assert the "market rate" in the "market area" was not only less than publicly posted rates but was exactly the same as the rate State Farm concluded was the "market rate" based upon its purported, unpublished survey.

Representatives of the Defendants have all made verbal statements to the Plaintiffs that full compensation for paint and materials will not be paid, whether by honoring the Plaintiffs' posted paint and materials hourly rate or refusing to honor the very precise PMC invoices.

227.    Plaintiffs have personal knowledge of these statements and will testify to the same for each Defendant named in this paragraph.

228.    Plaintiffs assert discovery will produce additional facts and evidence supporting the allegations of this Amended Complaint.

4.    Parts

229.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

230.    Numerous reliable sources have found aftermarket parts inferior to OEM parts. As noted above the California Bureau of Automotive Repair  found aftermarket parts inferior and the majority of them simply did not fit.  See Exhibit "3."

43

231.   Ford Motor Company has conducted crash tests comparing OEM crash part performance to aftermarket crash part performance.  The results, which are publicly available, found that not only did aftermarket parts fail to perform at the same level, but repair costs on vehicles fitted with aftermarket parts were often double that of OEM parts.[12]

232.   Consumer Reports reached the same conclusion, a report also publicly available.[13]

233.   Despite the fact that aftermarket and salvage parts have significant issues with safety, fit, form and function, the named Defendants insist on their use as the least expensive alternative.

234.   Safety issues are particularly paramount in replacing crash related parts.  Salvaged parts are not subject to any safety testing requirements or regulations.  They are, by definition, parts removed from other vehicles, almost exclusively vehicles which have already been wrecked and most frequently vehicles which have been damaged so badly as to be declared total losses.

235.   State Farm has recognized the safety issues associated with crash related parts by writing into its DRP language that "the following crash related parts, when subject to certification standards developed by an organization approved by State Farm, will be certified unless requested by the vehicle owner:

-bumper components
-lighting components
-radiator supports/tie bars and associated mounting components
-outer sheet metal and plastic/composite parts."

236.   Despite this, State Farm regularly and routinely writes estimates compelling use

---

[12] See, e.g., https://www.youtube.com/watch?v=LPly9QFteso

[13] See, e.g., http://www.consumerreports.org/cro/news/2010/08/video-knock-off-bumper-part-explodes-in-crash-test/index.htm

of salvaged bumper components, lighting components, radiator supports for repairs conducted at Plaintiffs' shops.  Examples include:

- Remanufactured (salvaged) bumper covers, front and rear, and salvaged bumper assemblies
- Used side panels (salvaged)
- Salvaged radiator panel, crossmember
- "Recycled" (salvaged) headlamp assembly and side marker lens
- Salvaged headlamp panel
- Salvaged taillamp assembly
- Salvaged radiator supports

237.    Other insurers have publicly recognized the safety issues with using crash-related salvaged and aftermarket parts. Defendant GEICO announced in January, 2010, it would no longer specify aftermarket parts for bumper reinforcements, brackets or energy absorbers due specifically to safety concerns.

238.    However, despite this, GEICO continues to specify aftermarket bumper parts such as brackets and supports.

239.    Farmers spokesperson Kitty Miller has publicly stated, "Farmers does not use salvage parts to replace axles, suspensions, or transmissions.  Most salvage parts are external sheet-metal parts."

240.    This is not a truthful statement.  The Farmers companies regularly require use of salvaged crash related parts including radiator supports, radiator assemblies, hoods,  bumper assemblies, and fender assemblies in estimates written for repairs at Plaintiffs' shops.

241.    In Alabama, Farmers representative Sarah Curtis has stated Farmers requires use of aftermarket and salvaged parts on all repairs and Farmers will only "approve" use of OEM parts if no aftermarket or salvaged parts are available at all.

242.    Estimates prepared by the Defendant insurers include regular and routine use of salvaged and aftermarket crash-related parts.

45

243. The insurance-industry wide practice of insisting on aftermarket parts, which are materially inferior and simply do not fit, or salvaged parts of dubious or unknown provenance, history and prior damage places Plaintiffs in the untenable position of either performing a repair with unsafe parts or performing safe repairs at their own expense.

244. Despite the well-publicized advertising statements of insurers such as State Farm, GEICO, Liberty Mutual and Allstate, among others, that "guarantee" their repairs for as long as the consumer owns the repaired vehicle, these companies' own documentation disclaims this purported guarantee specifically with respect to aftermarket and salvaged parts.

245. The estimates prepared by each Defendant insurer disclaim any warranties or guarantees for the parts they select and insist be used in a given repair.

246. The estimates prepared by each Defendant state that the manufacturer or distributer of the part is responsible for any warranties that may apply.

247. The immediate cost to the Plaintiffs is the loss of revenue and time lost in modifying aftermarket parts to fit, which the Defendants refuse to pay.  With salvage parts, the shop must clean and often repair the parts prior to use, when they are usable, and that is also time and labor which the Defendant insurers refuse to compensate the Plaintiffs.

248. As found by the California Bureau of Automotive Repairs, insurers regularly refuse to compensate shops for the time and labor required to modify aftermarket and salvage parts.  See Exhibit "3."

249. The long term outcome of the limiting language used by the Defendant insurers is the body shops shoulder the liability burden for failure or inadequacy of parts they had no voice in choosing.

250. For shops which do remain associated with direct repair programs, the threat and

potential cost is even greater.  Most DRP terms, such as those of State Farm, USAA, and

Progressive, require the shop to not only maintain an extensive liability policy with the DRP

sponsor as a named insured, (for which the shop bears solely premium payment responsibility)

but also contain language requiring the shop to assume liability for any problems arising from

parts selection and/or usage, and agree to indemnify the sponsoring insurer in the event the

insurer is found liable for its own action with regard to parts.

251.    Again, in the face of the combined market power exerted by the Defendants and

their unified insistence on use of aftermarket or salvage parts, the only recourse a shop has is to

purchase appropriate parts and work at a loss on each such repair, thus damaging the Plaintiffs.

252.    Plaintiffs aver upon their own knowledge that each named Defendant has required

the use of improper parts for repairs, refused to compensate them for parts costs which exceed

their own cost determination.

## STEERING

253.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to

convey that each and every defendant identified in Paragraph 14 engaged in the activity or

conduct described below. "Defendant insurers" or "the Defendants" should be read in such a

way that each defendant is having the allegations made about it individually.

254.    Within the body shop and insurance industry, "steering" is the term used to

describe the practice of insurers of coercing or otherwise convincing a consumer to withhold

patronage from a disfavored repair shop for failing to comply with fixed prices or insisting on

making full, complete and safe repairs.

255.    Steering generally takes the form of an insurer relaying false or misleading

information to a consumer after the consumer has identified a noncompliant target shop as the

repair facility the consumer wants to perform repairs.  Insurers will also steer using threats of economic consequences to the consumer if they persist in using the shop of their choice.

256.   Regardless of which insurer is involved, the Defendants' insurance representative ordinarily provides the same list of false or misleading "information" to consumers after they have selected one of the Plaintiffs' shops as their choice of repair facility.  Examples of these statements include but are not limited to the following:

- The consumer is required to take their vehicle to an approved shop for repairs;

- The selected shop is not on the insurer's preferred list;

- The insurer has received complaints about the quality of the shop's work;

- If the consumer takes their vehicle to the selected shop, repairs will take too long and the consumer will run out of rental car time and have to pay for a rental out of their own pocket;

- The selected shop charges too much or "overcharges" and the consumer will have to pay the difference;

- The insurer has received complaints about that particular shop from other consumers.

- The consumer is required to take their vehicle to an approved facility for an estimate before they are allowed to go to the repair facility the consumer has identified as the repair facility of their choice.

- The insurer will provide a guarantee on repairs performed at its preferred shops.

257.   With respect to the statement that a consumer must visit a preferred shop for an estimate before proceeding to the shop of choice for repairs, while all Defendants engage in this practice to some degree, GEICO appears to be the most aggressive.  GEICO claims handling

48

documents refer to this as "capture and retention."  If the GEICO employee handling the claim is successful at directing a vehicle to one of its direct repair shops for an estimate, the file is marked as a successful "capture."  One method of completing a successful "capture" is telling consumers they are required to have an estimate at a "preferred" shop before the consumer is permitted to take their vehicle to the repair shop of choice.

258.    If GEICO successfully compels repairs at the facility which "captured" the vehicle, this is designated a successful "retention."  GEICO internal documents repeatedly urge employees to capture and retain, directly tying such success to  increased company profits and increased profit-sharing bonuses for employees.

259.    The degree of steering has varied over the years but, upon information and belief, the hard core steering used by the Defendants against the Plaintiffs appears to have commenced approximately ten years ago, continuing to the present day.

260.    The following examples are certainly not intended to be an exhaustive list of each and every steering attempt.  However, Plaintiffs provide a few specific examples of such practices that include the following:

State Farm

261.    Despite a customer's request to have her car towed to Plaintiff Professionals body shop, State Farm informed her that they would not talk to or go to Professionals because they were not on the "preferred" list.  In addition, this customer was told that she would have to pay more and can not have a rental if she insisted on using Professionals.

262.    Another customer of Professionals was told that "it isn't too late to change to another repair shop" and to get an estimate "you must go to another repair facility."

GEICO

49

263.     A potential customer of Plaintiff Professionals, Tyler Chappini, was successfully steered by a GEICO claims handler.  Mr. Chappini was told that he had to have his car towed to a GEICO "DRP" shop.

ERIE

264.     If you go to our shops we can pay them directly and it will be faster.  That company is not on our preferred list.

265.     Additionally, each of the remaining Defendants have made comments such as the following:

- You will have to pay more if you go to the shop of your choice
- We won't warranty the repair of you go there.
- If you go to our network shop we will warranty the repairs
- We can't give you a rental car if you use them
- They are not on our preferred list.
- You must go to another repair facility/or to a drive-in estimate location to get a repair for your vehicle.

266.     In each of these examples, the vehicle owner had clearly identified a Plaintiff as the repair shop the consumer wanted to deal with, or had already taken their vehicle to one of Plaintiffs' shops.  In each instance, a Defendant insurer directly intervened in the business relationship (commenced or intended) through false statements, misrepresentations, implications of unethical conduct by the Plaintiff or  played upon the financial vulnerability of the consumer.

267.     Because of the nature of such things, the vast majority of evidence of successful steering lies solely within the control and custody of the Defendants themselves.  There is, however, sufficient evidence of both successful and unsuccessful steering efforts by the Defendants to reasonably conclude discovery will produce additional evidence of Defendants' actions.

Defendants' Steering Is Malicious, Punitive in Nature and Intentional

268.     The punitive and malicious nature of Defendants' interference is exemplified by the failed steering instances described above.  In each instance, the Defendant insurer refused to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of OEM parts designed to fit a particular vehicle, capping paint and materials or similar activities, or a combination of these actions.

269.     The outcome was the same–each Defendant paid only what it chose to pay regardless of the actual cost of repairs.

270.     Each Defendant paid only what it would have paid a direct repair or cost-compliant shop.  As such, steering becomes a financially pointless endeavor and does not benefit a demonstrably legitimate interest of the Defendants.  If each Defendant refuses to pay the full cost of repairs, regardless of where the repairs are performed, steering customers away from Plaintiffs' businesses can only be performed as a deliberate method to punish through improper means and attempts to compel compliance through financial coercion.

271.     Additional evidence of malice is the misrepresentation to consumers that certain difficulties attributed to Plaintiffs are actually and solely the result of the Defendant insurers' own deliberate choice.  The statement that repairs will take longer at a Plaintiff shop is not the result of the shop taking longer to complete a repair but a Defendant insurer's decision to delay every part of the repair.

272.     This usually commences at the beginning of the process where the Defendant insurer will delay sending a representative to the shop to perform an initial evaluation but threatens the shop that if work begins before they inspect, payment for repairs will be withheld.

273.     Quite often a Defendant insurer will tell both the customer and the shop an

estimator will be sent, but days or weeks will pass, calls are not returned and when someone finally answers the phone, will again assure all concerned an estimator is being dispatched, again with no result.  Only after considerable time has passed will a representative arrive for the initial evaluation, often  claiming the repair had "just been assigned."

274.    On average, the Defendant insurers take between three and eleven days to appear at Plaintiffs' shops to perform an initial estimate.

275.    Even where initial estimates are performed by Defendants in a relatively timely manner, or the Defendant insurer has successfully deceived a consumer into believing they are required to visit a preferred shop for an estimate prior to going to the shop of choice for repairs, repairs at the Plaintiffs' shops are delayed by the Defendant insurers by consistently refusing to address supplements, frequently telling the Plaintiffs and consumers that supplements were never submitted when they were.

276.    Even after acknowledging a supplement has been sent, the Defendant insurer will refuse to allow the additional work to commence until an in-person inspection of the supplemental work requested has been made or additional photographs submitted for review.  As noted above, all of the Defendants require a shop to obtain permission from them before performing work identified in supplements, though the choice and authority rests with the consumer, not the insurer.

277.    Also reprehensible are the Defendants' assertions that Plaintiffs' work cannot be guaranteed but if the consumer goes to one of their network or preferred shops, the insurer will guarantee the work.

278.    This is substantially misleading for three reasons.  First, no insurance company and certainly none of the named Defendants performs any repair work.  Therefore there is

nothing for them to guarantee and asserting to Plaintiffs' customers and potential customers they will guarantee the work is both misleading and inaccurate.  As phrased, Defendants' guarantee assertions reasonably lead consumers to believe the repairs are guaranteed by the insurer, which they are not.

279.    As noted, each Defendant insurer specially disclaims any warranty for repairs on the written estimates they or their representative prepares.

280.    Third, Defendant insurers' statements mislead Plaintiffs' customer and potential customers into assuming Plaintiffs' do not guarantee their own work.  Were this not the intent, to lead listeners to this conclusion, there would be no effect or gain to the Defendant insurers in telling consumers that work done at a network/preferred shop would lead to a guarantee, coupled with disavowal of guarantees at the Plaintiffs' shops.

281.    Again, steering is not limited to Pennsylvania.  Steering, performed for the purpose of harming shops who refuse to comply with fixed prices, is a national effort conducted by the Defendants across the country.

282.    Evidence set out in another case, *Price's Collision Center, LLC v. Progressive Hawaii Insurance Company*, Cause No. 12-873, pending in the Middle District of Tennessee is persuasive on this issue.  Mr. David Edwards, who was a long-term employee of Progressive Hawaii in the auto claims area, submitted an affidavit testifying Progressive **does** target specific shops for punishment.  Progressive's efforts include making derogatory statements about the body shop to consumers about the quality of work performed by the shop.

283.    Progressive would also deliberately refuse to pay legitimate repair costs when it was unsuccessful at steering customers away to preferred shops.  Progressive also exerted economic pressure upon consumers, telling them they would have to pay extra for going to the

shop of their choice, but if the consumer had gone to a network shop, they would not have to

pay.  See copy of affidavit of David Edwards attached hereto as Exhibit "7."

284.    Progressive Hawaii, the subject of Mr. Edwards' affidavit, is not a named

defendant in this action but other Progressive entities are, all of whom the Plaintiffs assert have

acted in the same manner as set out in Mr. Edwards' affidavit and described above in this

pleading.

285.    Additionally, a State Farm employee has admitted to Parker Auto Body, Inc., lead

plaintiff in the companion case of *Parker Auto Body, Inc. v. 21st Century Centennial Ins. Co.*,[14]

that it is State Farm's goal to drive independent body shops out of business, to turn all repair

business over to MSOs who comply with fixed prices.  As detailed below, several of the major

insurance defendants derive a direct economic benefit from steering business away from the

independent operators and into the service bays of MSOs.

286.    Apparently consistent with this national and agreed upon goal, it would appear

State Farm upper management is actively encouraging steering.  Estimatics management Richie

Gray has apparently been told by his superiors that steering is perfectly legal in Louisiana, which

it is not.

287.    No legitimate business interest of any of the Defendant insurers allows them to

defame the Plaintiffs with falsehoods, accuse the Plaintiffs of misdeeds and malfeasance which

is solely attributable to the insurers' own actions, or financially punish a shop when the cost of

their own actions and inactions becomes more than they wish to pay.

288.    These actions are intentional, willful and malicious, conducted by the named

Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of

---

[14]*Parker Auto Body, Inc., et al v. 21st Century Centennial Ins. Co.*, et al, Cause No.  6:14-cv-310, is also
pending before this Court.

a legitimate business interest and done with the intent to injure and damage the Plaintiffs

individually.

## Group Boycotting by the Defendants

289.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to

convey that each and every defendant identified in Paragraph 14 engaged in the activity or

conduct described below. "Defendant insurers" or "the Defendants" should be read in such a

way that each defendant is having the allegations made about it individually.

290.    As noted above, it is generally well accepted by the courts that insurers exert an

enormous amount of influence over where consumers take damaged vehicles for repairs.

291.    Insurance-paying customers constitute between seventy-five and ninety-five

percent of a given Plaintiffs' annual business.  Given these proportions, the effect of Defendants'

steering is dramatic.

292.    Plaintiff Professionals Auto Body was associated with the State Farm DRP until

2012.  State Farm immediately began its campaign–telling customers and prospective customers

who had identified Professionals as their chosen body shop that State Farm had been having a

hard time with Professionals, that the customer would have to pay more if they go to

Professionals, that Professionals took too long to complete repairs, that the customer would have

to pay out of pocket for Professional  overcharging and that Defendant can not give the customer

a rental car if Professionals is used.

293.    State Farm began telling customers and potential customers these things, knowing

they were false.

294.    After disassociating from State Farm's DRP in 2012, State-Farm-paying

customers dropped by nearly fifty percent (50%) by the close 2013.  Since 2012, Professionals

State-Farm-paying customers have been reduced on average approximately forty percent (40%).

295.    As these numbers show, the effect of Defendants' steering has a dramatic impact upon the financial health of the Plaintiffs' businesses and their ability to remain open as a going concern.

296.    Disassociation from a DRP is not the only "trigger" for group boycotting by the Defendants.  It is, however, one of the most obvious.

297.    The vast majority of boycotting events are within the sole possession and control of the Defendants, either in claim diary entries made by Defendant representatives or the recorded telephone conversations between the Defendants and their insureds and claimants when claims are made or discussed.  A complete recitation of every event is not possible.  Unless a consumer returns to a Plaintiff's shop to report they were steered away from doing business with a Plaintiff,  the Plaintiffs cannot know the event occurred.

298.    However, Plaintiffs can and have asserted specific, direct evidence instances of steering, both successful and unsuccessful, to raise a more than reasonable probability that Defendants do engage in the behavior alleged.  Plaintiffs have also produced circumstantial evidence in the form of inexplicable sudden reductions in their consumer base from multiple Defendants' insureds and claimants which can be tied to at least one specific event, such as disassociating from a DRP.  Individually, these facts  provide more than sufficient probability that discovery will produce additional facts in support of Plaintiffs' claims.

299.    Defendants actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

Willful Misconduct in Concerted Action by Defendants to Boycott

300.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

301.    Steering against noncompliant shops is not limited to retaliation by insurers whose DRPs a Plaintiff shop has left.  The Defendants share this information amongst and between themselves and steer business away from noncompliant shops as a group. Noncompliant shops are specifically targeted by the group of Defendant insurers.

302.    Plaintiff Professionals disassociated from State Farm's DRP in 2012:

•    After leaving State Farm's DRP, Professionals lost approximately forty (40%) percent of its Allstate-paying customers.
•    After leaving State Farm's DRP, Professionals lost over seventy-five (75%) percent of its Harleysville-paying business.
•    After leaving State Farm's DRP, Advantage lost over forty (40%) of its Erie-paying business.

303.    Curiously, once Professionals disassociated with the "DRPs" in 20112, other insurers began telling customers who identified Plaintiff Professionals as the repair shop of choice the very same false assertions as did State Farm, to wit, Professionals overcharges, Professionals takes too long to repair cars and the consumer will have to pay for additional car rental days.

304.    In the absence of some notice by State Farm  to the other insurers that Plaintiff Professionals was no longer "protected," the sudden onset of steering by insurers who had no reason to engage in defamatory actions prior to the disassociation makes no sense.

305.    As can be seen above, steering against noncompliant shops is not limited to retaliation by insurers whose DRPs a Plaintiff shop has left.  The Defendants share this

information amongst and between themselves and steer business away from noncompliant shops as a group.

306.     Defendants are fully aware of the effect of their boycotting and State Farm, at a minimum, has admitted to the intention to drive independent body shops out of business so as to consolidate repairs at cost-compliant MSOs.

307.     The only reasonable conclusion from these facts is the named Defendants shared information about and specifically targeted as a group the particular shops who refused to comply with Defendants' fixed pricing structures, parts procurement rules and general belief the body shops should simply be quiet and do as they are told by the insurance industry.

308.     Given the common nature of the false statements made by numerous Defendants, it is also only rational to conclude the high probability of prior agreement as to the most effective statements to make to successfully steer customers away from the targeted shops.

309.     The Defendants collectively control the vast majority of the market share within the State of Illinois.  Group boycotting by the Defendants substantially impairs the ability of Plaintiffs to engage in their lawful profession.

310.     As the majority of insured vehicles are under the influence of the Defendants and the Plaintiffs derive between seventy five and ninety five percent (75-95%) of their business from the Defendants' insureds and claimants, it is simply not economically viable for Plaintiffs to simply refuse to accept insurance-paying customers.

311.     Significantly, none of the Defendant insurers ever actually identified a single instance of wrongdoing or malfeasance by any of the Plaintiffs they were defaming in the course of their group boycotting, not even with an example that omitted personally identifiable information.  They merely stated or implied bad acts were occurring.

312.     The statements described above made by the Defendant insurers were solely to interfere in the business relationship, established or prospective, of the Plaintiffs.

313.     Defendants' actions were intentional, coordinated, relied upon shared information and utilized common methods and content.

314.     Based on known facts, Plaintiffs assert discovery will adduce additional evidence of coordinated boycotting by the Defendants.

## OPPORTUNITIES FOR DEFENDANTS TO CONSPIRE

315.     Opportunities for individuals sufficiently high enough within the Defendants' corporate structure to make or influence substantive decisions exist in abundance.

A.     Trade Associations

316.     Currently available documentation established that every national insurer and the vast majority of regional insurer belong to at least one of the three major insurance industry trade associations:

- American Insurance Association (AIA) : Defendants The Hartford, Erie, Safeco, Travelers, United Services Automobile Association, and USAA  are all members of the AIA. In addition to general membership, from time to time over the course of at least ten years, Defendants, Safeco, the Hartford, Travelers, and USAA have all served in positions of authority within the AIA, including the AIA Board.

317.     Plaintiffs are currently without knowledge as to whether the remaining Defendants are individual members of AIA or other trade association.

- The Property Casualty Insurer Association of America (PCI): Defendants Allstate,  GEICO, Liberty Mutual, Progressive, are all members of PCI.  In addition to general membership, from time to time over the course of at least ten years, these Defendants have all served in positions of authority within the PCI, including the PCI Board.

318.     Plaintiffs are currently without knowledge as to whether Defendants Encompass Insurance, Encompass Property and Casualty and eSurance are individual members of PCI or

other trade associations.  However, these Defendants are subsidiaries of defendant Allstate, which is a member of PCI.

• The National Association of Mutual Insurance Companies (NAMIC): Defendants Nationwide, and State Farm are members of NAMIC.  In addition to general membership, Nationwide, Pennsylvania National and State Farm have, from time to time over the course of several decades, served in positions of authority within NAMIC, including the NAMIC Board.

319.  The members of the companies representing these Defendants on the respective boards, in  positions of authority and at general meetings are almost exclusively within the highest tier of executive level at each Defendant insurer company.

320.  For instance, GEICO CEO and Chair Tony Nicely has frequently assumed a position on the board of PCI.  Others who have served over the years include but are not limited to Liberty Mutual's former chairman and CEO Edmund Kelly, and Allstate's president, chairman and CEO, Thomas Wilson.

321.  As Nationwide and State Farm have both been members of NAMIC since at least 1961, the list of executives of both companies who have served on the board of NAMIC and its various executive committees is extensive.

322.  Board meetings and other leadership obligations regularly bring the high ranking members of Defendants' companies together, specifically for the purpose of discussing insurance issues, how to advance insurance interests, lobby for legislative favor and generally increase the profitability of the insurance industry.

323.  The associations frequently act in concert, bringing the members and boards together as well, also specifically for the purpose of advancing the insurance industry.  For instance, the associations work together to prepare and present a joint statement on Senate Regulatory Reform Legislation, lobbying Congress to renew the Terrorism Risk Insurance Act,

as well as the annual P/C Insurance Joint Industry Forum.

324.    Based upon available information and belief, discovery will provide additional evidence as to the remaining Defendants memberships in one or more insurance trade associations.

B.      Insurance Institute of Highway Safety

325.    The Insurance Institute of Highway Safety (IIHS) is described as "an independent, nonprofit scientific and educational organization dedicated to reducing the losses - deaths, injuries and property damage - from crashes on the nation's roads."

326.    This organization asserts that among other things, it conducts scientific tests upon vehicle crash worthiness and crash avoidance and rates the results, information which is often well publicized as a selling point in advertising the safety of a vehicle, or of a crash part.

327.    Current members of the board of directors include senior executive from Defendants Farmers, USAA, GEICO, Progressive, Liberty Mutual, Hartford, Travelers, Nationwide.

328.    Not only does general membership and board membership provide the vast majority of the Defendants  with additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans, but the organization itself is influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts, which directly financially benefits the Defendants.

329.    As discussed above, all of the Defendants regularly and routinely compel purchase and use of aftermarket and other non-OEM crash parts for use in the repairs for which each is financially responsible.  The organization therefore provides combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendants.

330.    Not only does general membership and board membership provide the vast majority of the Defendants  with additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans, but the organization itself is influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts, which directly financially benefits the Defendants.

331.    As discussed above, all of the Defendants regularly and routinely compel purchase and use of aftermarket and other non-OEM crash parts for use in the repairs for which each is financially responsible.  The organization therefore provides combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendants.

C.      CAPA

332.    CAPA, the Certified Automotive Parts Association bills itself as a non-profit organization established in 1987 to develop and oversee a test program guaranteeing the suitability and quality of automotive parts.  Specifically, aftermarket parts.

333.    When either the insurance industry or the collision repair industry discusses parts certification, almost exclusively the reference is to CAPA.  CAPA purportedly sets quality standards and conducts studies of aftermarket parts.

334.    What is generally not discussed is that CAPA was founded and predominantly funded by representatives of the insurance industry, including Defendant State Farm, specifically for the purpose of reducing collision repair costs.

335.    Current Board of Directors for CAPA include State Farm, Allstate, Liberty Mutual and GEICO, Clark Plucinski, President of the Boyd Group, which operates the Gerber Collision repair shops (and DRP shops for Allstate, State Farm and GEICO), Tim Adelmann of ABRA, Inc., another MSO collision repair shop like Gerber (and also DRP shops for Defendants

62

State Farm, Allstate , GEICO, USAA, Nationwide and Progressive.

336.    As with membership in the IIHS, board membership for CAPA provides not only additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans by and between the largest property casualty insurers in the United States but CAPA is a crucial cog in its well-established corporate policy of purchasing less expensive aftermarket parts whenever possible.

337.    The Defendants have gone to great lengths over many years to convince the public and various state agencies of the safety and interchangeability of aftermarket parts with OEM parts.  Acceptance of this premises is directly financially beneficial to the Defendants as it provides immediate reward in the form of drastically reduced claims they must pay out.

338.    The impartiality of CAPA, as the creation of the insurance industry, financed by the insurance industry and openly working toward the insurance industry goal of reduced claims costs, is worthy of gaze with a weather eye.  This healthy skepticism is assisted by the substantial number of aftermarket parts CAPA de-certifies because they are of too poor quality to be in the stream of commerce.

339.    It is important to remember de-certification removes certification from aftermarket parts CAPA has already purportedly studied, tested and pronounced as quality collision repair parts.

340.    Last year, CAPA de-certified over a thousand aftermarket parts, many of them crash and safety parts, many of them for the most popular vehicles in the country, including hoods and fenders for Toyota Camrys, fenders, hoods and headlamp assembly for Honda Accords, headlamp assemblies for Subaru Outbacks, hoods for the BMW 3-Series, hoods, bumper covers, fenders and fog lights for BMW 5-Series, radiator supports for Dodge Chargers,

Ford Edge, Ford Focus, Lincoln MKX, Mazda 6, Nissan Altima, Volkswagen Jetta and Honda Civic, among many others.

341.    Through this organization, the largest insurers representing the Defendants' mutual interests are in a position to not only make agreements affecting the body shop payment structure but to ensure a generous supply of thousands of inexpensive, imitation aftermarket parts is available for the Defendants to compel purchase to further reduce the money they must pay out as claims.

## MOTIVE TO CONSPIRE

342.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

343.    Each of the Defendants has an obvious motive to agree, combine and conspire to fix prices, boycott and punish noncompliant shops and interfere with Plaintiffs' businesses at every possible level.  Profit.

344.    If the profits were minimal, the value of such a combination or agreement would be questionable.  However, the profits are not minimal.

345.    In 2013, State Farm reported a net income increase of 63%, resulting in a record high net worth of $75.9 billion.  Its underwriting gain was announced at $230 million.

346.    Allstate reported a 2013 net income of $2.3 billion dollars.

347.    GEICO reported 2013 profits of $1.1 billion..

348.    Progressive reported 2013 net income of $1.16 billion.

349.    USAA reported 2013 net income of $2.7 billion dollars.

350.     Without even considering the remainder of the Defendants, these amounts can be placed into perspective:  The top five market share holders in the State of Pennsylvania had higher net incomes in 2013 than the gross national domestic product of eight African countries combined.  It is represents more money than was spent on the entire defense budget by Oman, Jordan, Afghanistan, Venezuela or Pakistan in 2013, none of which are generally known as peaceful havens.

351.     Additionally, the Defendants have a direct opportunity to substantially affect and increase their respective bottom lines.

352.     In insurance industry parlance, the "float" is the monies collected by insurers as premiums that are not–or not yet– obligated for payment of claims or operating expenses. Rather than just sitting on the float, an insurer is free to invest it and pocket the profit from those investments.  Documentation publicly available shows the majority of the named Defendants invest through BlackRock, Inc.

353.     Defendants State Farm, Allstate, Nationwide, USAA, SAFECO, and GEICO  are all invested in or through BlackRock.[15]

<u>BlackRock and Service King</u>

354.     BlackRock, Inc. ("BlackRock"), is the largest asset management firm in the world.  BlackRock also engages in private equity investing, purchasing ownership interest in companies.  BlackRock boasts on its website that it manages $4.32 trillion in assets, manages 7,700 portfolios and has twenty of the top twenty-five insurers as its investors.

355.     BlackRock holds majority ownership of Service King, a collision repair multi-

---

[15]Swiss Re is one of BlackRock's larger institutional investors.  GEICO's ultimate parent company, Berkshire Hathaway, owns 3.01% of voting rights in Swiss Re.  BlackRock owns approximately 10.04% of voting rights.

shop operator ("MSO").  BlackRock purchased majority ownership of Service King from private

equity and asset management firm, Carlyle Group, which retains minority ownership. Service

King is a DRP for Allstate, State Farm, GEICO, Hartford, Liberty Mutual, Progressive, Shelter,

Nationwide, and USAA.

356.   Service King, in turn, owns MSO Sterling Collision Centers ("Sterling").  Service

King purchased the collision centers from Defendant Allstate.  In *Allstate Ins. Co. v. Abbott*,

2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2007), Allstate's ownership of body shops (Sterling)

was found to violate a Texas state law prohibiting (among other things) insurers from owning

repair facilities (affirmed, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir.

Tex., Aug. 1, 2007)(cert. denied, *Allstate Ins. Co. v. Abbott*, 128 S. Ct. 1334, 170 L. Ed. 2d 66,

2008 U.S. LEXIS 1297 (U.S., Feb. 19, 2008).  Sterling has sixty two locations across the

country.

357.   Thus, these defendants, and their subsidiaries, obtain a two-fold profit by steering

customers to MSOs owned or controlled by BlackRock: a front-end profit is made by the

Defendants through the suppressed payment of costs for repairs to Service King (and Sterling),

which these MSOs are willing to accept in return for the volume business resulting from

steering.  The insurer Defendants pay out less on a claim as an initial matter.

358.   These Defendants also reap a back end benefit via their investment through

BlackRock.  The more cars the MSOs repair, the greater the return on the investment.  Thus,

claims payments made to Service King are, in essence, financially a wash, as dollars spent on

claims paid to Service King return to the insurance investors as investment profit.

359.   The Defendants reaping these "coming and going" profits include, but are not

necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, and Safeco.

360.     Based upon information and belief, discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock and therefore directly profit from steering to investment portfolio holdings, including Service King and/or Sterling collision repair centers.

<u>BlackRock and Paint and Materials</u>

361.     BlackRock, via one of its numerous investment vehicles, BlackRock Institutional Trust Company, N.A., (referred to collectively as "BlackRock") owns a significant amount of shares in PPG Industries ("PPG"), which manufactures and sells automobile paint used in the collision repair industry.  As of September, 2014, BlackRock was the third highest shareholder of PPG, owning 5.7 million shares.[16]

362.     Upon information and belief, PPG offers substantial discounts to MSOs and non-MSO shops which are members of DRPs, sometimes up to seventy percent (70%).

363.     Upon information and belief, PPG withholds these substantial discounts from non-DRP shops.

364.     These discounts encourage purchases by the MSOs and DRP shops.  At the same time, Defendant insurers, particularly but not limited to GEICO and Nationwide which cap paint and materials payments, refuse or reduce payment to Plaintiff shops for paint, stating the charges are excessive because other shops, i.e., MSOs and compliant DRP shops, are able to perform paint tasks for less money and the paint cap imposed is therefore reasonable.

365.     Defendants and their subsidiaries holding investments in or through BlackRock obtain a two-fold profit by steering customers to MSOs and DRPs.  On the front end, Defendants

---

[16]BlackRock's share ownership in PPG has varied but overall has steadily increased over the last several years, nearly doubling since June, 2011, when it owned 3 million shares.  This increase in share ownership coincides with BlackRock's growing acquisition of MSO facilities, such as Service King.

are able to suppress and reduce claim payments related to paint and paint materials on the ground that costs above their caps are out of line with "the market," thereby retaining funds they would ordinarily have to pay out as claims.

366.   On the back end, Defendants who invest with or through BlackRock profit through increased sales of the products manufactured and sold by the company in which they have invested, PPG.   Therefore claims payments made to MSOs for paint and paint materials are, in essence, financially a wash, as dollars spent on claims paid return to the insurance investors as investment profit.

367.   The Defendants reaping these "coming and going" profits include, but are not necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, and Safeco.

368.   Based upon information and belief, discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock and therefore directly profit from steering to shops using PPG paint via their investment portfolio holdings.

<u>BlackRock and Parts</u>

369.   BlackRock also owns a substantive portion of LKQ Corporation ("LKQ") stock (8.55 million shares).   LKQ Corporation is a leading supplier/seller of "recycled" (i.e., salvaged from junk yards) auto parts.   LKQ's subsidiary, Keystone Automotive Industries, Inc., ("Keystone") is the largest supplier of aftermarket (i.e., counterfeit) parts in the United States.

370.   Salvaged and aftermarket parts seldom fit properly, as discussed in detail above. However, every named Defendant in this cause writes repair estimates specifying the purchase of repair parts from LKQ and/or Keystone.[17]

371.   This is required even when a particular insurer's on-the-ground adjuster or

---

[17]Depending upon the type of repair being performed, parts from either or both LKQ and Keystone may be required.

estimator is fully aware a part is not available through either LKQ or Keystone.  The adjuster or estimator will still write the estimate for use of those parts.

372.    When a Plaintiff shop either refuses LKQ or Keystone parts, or none is available in a timely manner and must therefore be purchased from another source, the Defendants refuse to compensate Plaintiffs for anything more than the part could have been purchased (either in reality or theoretically) from those sources.

373.    Defendants and their subsidiaries holding investments in or through BlackRock obtain a three-fold profit from these actions.  One, Defendants are able to suppress and reduce claim payments related to parts purchases, thereby immediately retaining funds that would otherwise be paid out on claims repairs.

374.    Second, Defendants generally refuse to pay labor and other costs associated with modifying salvaged and/or aftermarket parts to fit a vehicle, although use of such parts is entirely at the direction and insistence of the Defendants.  Defendants thereby retain funds which should be paid out on claims repairs.

375.    Third, Defendants who invest with or through BlackRock profit through increased sales of the products sold by the companies in which they have invested, LKQ and its subsidiary, Keystone.  Therefore claims payments made for parts purchases from LKQ and Keystone are, in essence, financially a wash, as dollars spent on claims paid return to the insurance investors as investment profit. The Defendants reaping these tripartite profits include, but are not necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, and Safeco.

376.    Based upon information and belief, discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock and therefore directly profit from parts purchase specification to investment portfolio holdings, including LKQ and Keystone.

<u>Necessity of combination or conspiracy</u>

377.    Although several of the largest Defendants are known investors of or through BlackRock, in the absence of group agreement, the profit motive would not be worth the effort in the absence of a combination or conspiracy amongst the Defendants.

378.    A single insurer engaging in the actions described in this Complaint would generate such a small effect upon the large investments of the Defendant insurers that it would not noticeably alter investment returns.  The more insurers who participate in steering, compulsory parts purchases and paint cost manipulation, the greater the substantial profit for all.

**IN THE ABSENCE OF AN AGREEMENT AMONG THE DEFENDANTS, THEIR ACTIONS WOULD INDIVIDUALLY BE CONTRARY TO BEST INTERESTS**

379.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to convey that each and every defendant identified in Paragraph 14 engaged in the activity or conduct described below. "Defendant insurers" or "the Defendants" should be read in such a way that each defendant is having the allegations made about it individually.

380.    If taken individually, the Defendants' actions would be contrary to their own best interests.  Such actions would substantially harm a lone Defendant.

381.    An auto insurer's mandate is to insure risk and, when that risk is realized, to pay the loss incurred.  An auto insurer which regularly fails or refuses to pay for full and complete repairs to vehicles, insists on using salvaged or imitation parts, or in any fashion left a vehicle unsafe or noticeably less safe to operate would very likely soon find itself losing its customers to other insurers.

382.    This is particularly so in a world of instant communication, people like to share and they are able to share with the entire world in the push of a Twitter button or Facebook post.  Stories of complete failure to repair and just as complete lack of concern by the insurer as related

above, would substantially damage both the reputation and the viability of the business as a going concern.

383.     The overwhelming power exerted by the group of Defendants allows the evidenced scheme to succeed.  While one or two Defendants leaving the group could find stability or even marginal additional success as the companies who care and pay for proper repairs, the remainder would far outstrip the minority in sheer profits.

## EFFECTS ON COMPETITION IN THE BODY SHOP INDUSTRY

384.     Defendants actions have effectively removed all competition from the collision repair industry and constitute an unreasonable restraint of trade.

385.     While it may certainly be said the Defendants actions have achieved great effect for the insurance industry, particularly in the area of financial profit, it cannot be said Defendants actions have in any fashion stimulated competition in the collision repair industry.  Whether competition between insurers is robust is irrelevant, whether the insurance industry has benefitted from its illegal actions is irrelevant.  Considering that would be very much the same as suggesting a thief who has profited by his deeds justifies the loss to the victim and is therefore excused.

386.     The Plaintiff body shops are not in competition with the Defendants.  As traders within an identifiable market product, auto collision repair, the effect of competition between collision repair shops is the only effect to be measured.

387.     In the present case, there is no competition whatsoever.  Competition presumes a free and open market, where innovation is encouraged.  That is not the present state of the body shop industry.  There have been no economies or efficiencies created within the body shop industry, nor have prices decreased as a result of a dynamic market, nor incentives created.

388.    The Defendants fix price ceilings for the Plaintiffs, as well as all other body

shops.  The Defendants generally leave a particularly fixed price structure in place for several

years in a row.  The determined "market" or "prevailing" rate for the State of Pennsylvania was

$42.00 per hour body labor for at least two years.

389.    Attempts at expansion are not rewarded, investments in capital equipment is

risky, though necessary as federal guidelines regarding gas mileage minimums continue to

rapidly evolve the physical structure of vehicles, requiring new equipment, new training and

substantial investment.

390.    Consumers have not benefitted by the absence of collision industry repair

competition.  To the contrary.  As shown above, the repair shops to which the Defendants

encourage patronage quite often do extremely poor work, very dangerous work and a consumer

is left is a worse position than whence begun.  Quality is not encouraged nor even necessary as

the fixed prices/ punishment system created and perpetuated by the Defendants as a concerted

group rewards the worst body shop at the same level as the very best.

391.    Certainly some body shops are successful.  But negative effects on competition

are not weighed and measured by the effect on competitors, but on competition.

392.    In this case, the Defendants violations of state and federal law have effectively

eradicated competition in the body shop industry.  The Defendants actions have had a wholly

detrimental effect on the body shop industry and are detrimental to the public.

## <u>INTENTIONAL NATURE OF DEFENDANTS' WRONGFUL CONDUCT</u>

393.    Allegations referencing "Defendant insurers" or "the Defendants" are intended to

convey that each and every defendant identified in Paragraph 14 engaged in the activity or

conduct described below.  "Defendant insurers" or "the Defendants" should be read in such a

way that each defendant is having the allegations made about it individually.

394.    In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York.  The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit "8."

395.    Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

396.    These are the exact same practices the Defendant insurers have engaged in and which are the subject of this Amended Complaint.

397.    The Consent Decree provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection

therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

398.     The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

399.     The clear terms of the Decree apply to and are binding upon "each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise."

400.     Except as noted otherwise above, the named Defendants are members of the contemporary associations which are still bound by the Consent Decree's terms.

401.     1963 Defendant Association of Casualty and Surety Companies merged with the American Insurance Association ("AIA") in 1964 to form the "present-day AIA."

402.     As the successor organization upon completion of the merger in 1964, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the AIA and its members, and all other persons in active concert or participation with the AIA, whether

74

or not an actual member of the AIA.

403.    1963 Defendant American Mutual Insurance Alliance became the Alliance of American Insurers in 1977 when membership was opened to stock and other non-mutual insurance companies.  The Alliance of American Insurers subsequently merged with the National Association of Independent Insurers to form the present-day Property Casualty Insurers Association of America ("PCI").

404.    As the successor organization upon completion of all mergers to date, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the PCI, its members, and all other persons in active concert or participation with the PCI whether or not an actual member of the AIA.

405.    The Defendants which are known to be members of AIA are set forth above. Plaintiffs anticipate discovery will disclose additional members of this association.

406.    1963 Defendant National Association of Mutual Insurance Companies ("NAMIC") remains intact and active to the present day.  The terms and requirements of the 1963 Consent Decree are binding upon and enforceable against NAMIC and its members, and all other persons in active concert or participation with the NAMIC, whether or not an actual member of NAMIC.

407.    Except as noted above, all the named Defendants are known to be members of these organizations and are directly bound by the terms of the 1963 Consent Decree.

408.    The Defendants who are not known at this time to be individual members of the association, however, are acting in active concert and participation with the remaining Defendants, have knowledge of the 1963 Consent Decree and they are therefore bound by the terms and conditions of the Consent Decree, whether or not they are a member of any of the

associations.

409.    However, upon information and belief, discovery will likely uncover these four

Defendants' membership in one or more of the three applicable trade associations or associations

affiliated with the three applicable trade associations.

410.    Defendants actions violate the terms of the 1963 Consent Decree by effecting

plans, programs or practices which have the purpose or effect of (a) directing, advising or

otherwise suggesting that any person or firm do business or refuse to do business with any

independent or dealer franchised automotive repair shop with respect to the repair of damage to

automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to

automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to

be charged by independent or dealer franchised automotive repair shops for the repair of damage

to automotive vehicles or for replacement parts or labor in connection therewith, whether by

coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

411.    As such, it can only be said that Defendants were fully aware their actions, plans,

programs, and combinations and/or conspiracy to effectuate the same have been willful,

intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

412.    Defendants are therefore liable to Plaintiffs for punitive damages.

**CAUSES OF ACTION**
**COUNT ONE: VIOLATIONS OF THE SHERMAN ACT - PRICE FIXING**

413.    The United States economy rests upon open market systems in which vigorous

competition benefits individuals and businesses alike.  The federal government has long

recognized the necessity of public policies and a regulatory framework designed to foster and

protect the free market system from activities that restrict interstate commerce and/or

marketplace competition.

414.     The Sherman Act, passed in 1890 as U.S.C. §§ 1-7 and amended by the Clayton Act in 1914 (15 U.S.C. §§ 12-27)  functions "not to protect businesses from the working of the market; [but] to protect the public from the failure of the market.  The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).

415.     The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

416.     Through parallel actions, and\or explicit agreement, the Defendants have formed and engaged in a conspiracy or combination to fix and impose maximum price limits upon the Plaintiffs for their products and services.

417.     The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. vs. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

418.     The Defendants and co–conspirators have engaged in combination and/or conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

419.     The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops as shown by the "market rate" adopted by the Defendants as a group, though none are purported to have access to the survey conducted by only one of them;

uniformity of prices fixed across mixed population centers though the "market rates" are

purported to relate to an undefined but specific geographic area; specific statements by the

named Defendants adhering to a single fixed price formulated by one member of the

combination or conspiracy and adopted by all, uniformity of action in instances where

Defendants should not have access to particular information; to wit, State Farm does not publish

or make public its survey results, without mathematical value though it is, and the remaining

Defendants do not conduct their own purported survey and yet reach the same "market rate" as

State Farm.

420.    The Defendants all raise their "market rates" contemporaneously or within days

of State Farm raising their rates, although, again, these Defendants are not supposed to have

access to State Farm's information.

421.    State Farm regularly and routinely seeks to keep what it considers proprietary

information, including internal training and assessment manuals, sealed from public view.

422.    The Defendants all utilize and admit the applicability of the body shop industry

databases but regularly and routinely ignore the databases in the exact same fashion, i.e, calling

the same procedures included operations when the databases say the opposite, denying the

applicability of processes and procedures the databases states are necessary repairs, admitting the

baseline application of the industry database but failing to conform to that minimum standard,

numerous defendants telling different Plaintiffs each is the only one to perform or demand

payment for the same set of processes, i.e., seat belt safety checks, detailing for delivery and

denib and finesse.

423.    The aforesaid offenses have had, among others, the effect of eliminating

competition within the automobile damage repair industry, elimination of some shops from a

substantial segment of the automobile damage repair industry for refusing or attempting to refuse

the Defendants' arbitrary price ceilings, harming consumer choice and public interests,

subjecting repair shops to collective control and supervision of prices by the Defendants and co-

conspirators.

424.    Neither the Plaintiffs, nor other members of the auto collision repair industry are

able to engage in competitive business practices as the Defendants have effectively and

explicitly determined what their business practices will be.

425.    The United States Supreme Court has held that direct evidence of an agreement is

not necessary to establish a violation of the Sherman Antitrust Act.  Some factors which have

been held a sufficient showing of an agreement in violation of the Sherman Act include parallel

behavior that would probably not result from chance, coincidence, independent responses to

common stimuli, or mere interdependence unaided by an advance understanding among the

parties. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, FN4  (2007).

426.    Defendants actions constitute behavior which is likely not the result of chance,

coincidence, independent response to common stimuli or mere interdependence unaided by an

advance understanding.  Evidence of this include, but is not limited to:

- All of the Defendants fix prices at particular amounts which are unrelated to the actual prices charged by Plaintiffs which Plaintiffs publicly post;

- The prices fixed by Defendants are all below the prices charged by Plaintiffs which Plaintiffs publicly post;

- None of the Defendants save State Farm purport to undertake any survey or other analysis of the prices charged by body shops to determine a going rate in the body shop industry within the State of Pennsylvania;

- All of the Defendants fix prices at what they claim is the market rate, which is identical to the rate State Farm's flawed methodology claims it to be;

- State Farm does not publish or otherwise make publicly available its survey

results yet each of the other named Defendants enforce the same purported
"market rate;"

- State Farm's method of determining the market rate is contrived and fabricated
  and not based on any recognized method of mathematical or statistical analysis;

- A State Farm employee has admitted State Farm controls and manipulates the
  market, setting the "prevailing competitive price" at whatever amount State Farm
  chooses and State Farm intentionally sets out to control and suppress, i.e., fix, the
  body shop labor market;

- All Defendants assert the market rate is the same  though posted rates show
  variability as would be expected;

- The likelihood of all Defendants independently reaching the same conclusion as
  State Farm as to the market rate is statistically impossible, as State Farm creates
  the market rate from whole cloth, does not account for variability across large
  distances as in differing population centers;

- All Defendants change their rates immediately following a rate change by State
  Farm, though, again, none of them undertake any survey or analysis of prices
  charged by body shops and therefore cannot be cognizant of any purported
  changes in the market;

- All Defendants change their rates to the same rates as State Farm, though, State
  Farm does not publish or make publicly available its survey results;

- All of the Defendants have admitted they pay rates in conformity with State Farm
  rates;

- Defendant representatives from other states have specifically stated that State
  Farm sends out its survey results to other insurers which prompts changes in the
  fixed labor rates paid to body shops;

- All Defendants apply the databases in the same fashion, and all exclude payment
  for the same processes and procedures for the same stated reasons, even when
  those reasons are contradicted by the databases and the ordinary practices and
  procedures of the body shop industry.

- Defendant insurers meet regularly and State Farm has disclosed the Defendant
  insurers discuss and strategize with each other payment of body shop charges at
  these regular meetings.

- None of the Defendants individually hold a majority of the market share within
  the State of Pennsylvania; collectively, the named Defendants control over eighty
  three percent (85%) of the insurance market within the State of Pennsylvania and

are able to compel fixed prices upon the Plaintiffs which none would be able to accomplish in the absence of combination or conspiracy.

- Engaging in conduct to keep their conduct secret including, but not limited to prohibiting members of the body shop industry from attending meetings of insurance representatives wherein State Farm explicitly stated body shop labor rates and data base application and payment of procedures were discussed.

427.   It is implausible that all of these events occur regularly and over the course of years as the result of chance or coincidence.  The only plausible inference from these facts is that the Defendant insurers have agreed and conspired to establish fixed rates within the entirely separate industry of collision repair shops.  That these actions are clearly motivated by profit and self-interest does not make them any less actions taken in conformity with a conspiracy or combination in restraint of trade.  In fact, it may be logically asserted that all conspiracies or combinations in restraint of trade are motivated by profit and self-interest.  The mere fact that Defendants' conspiracy or combination in restraint of trade may be motivated by profit and self-interest does not make it any less a violation of federal law.

428.   Horizontal price fixing is per se illegal.  *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2239 (U.S. 2013), *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (U.S. 2007), *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (U.S. 2006).  No showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. Where there is a per se illegal price-fixing agreement, it is no defense that the agreement at issue did not have anticompetitive effects, or that defendant's motives were benevolent. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218 (U.S. 1940)*.*

429.   The Defendants' actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT II
## VIOLATION OF THE SHERMAN ACT - BOYCOTT

430.    The Sherman Act makes every contract, combination, or conspiracy in

unreasonable restraint of interstate commerce illegal.  26 Stat. 209, as amended, 15 U.S.C. §1.

431.    While most Sherman Act claims are analyzed under the rule of reason standard,

some actions pose such a habitual unacceptable risk of restraining trade they are unreasonable

*per se*.  *Vacation Break U.S.A., Inc. v. Mktg. Response Grp.*, 169 F.Supp. 2d 1325 (M.D. Fl.

Tampa Div. (Mar. 26, 2001).

432.    The United States Supreme Court has repeatedly held that group boycotts are *per

se* violations of the Sherman Act.  See, *e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127,

86 S. Ct. 1321, 16 L. Ed. 2d 415 (1966); *Radiant Burners v. Peoples Gas Light & Coke Co.*, 364

U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S.

207, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959); *Fashion Originators' Guild Assoc. v. FTC*, 312 U.S.

457, 61 S. Ct. 703, 85 L. Ed. 949 (1941)(boycott designed to coercively influence trade

practices, rather than to fully eliminate boycott victims from the market held still *per se* illegal).

433.    Those decisions that have rejected the *per se* rule generally applied to boycott

activity in favor of a rule of reason analysis have been limited to circumstances where the

conduct complained of may reasonably be shown to fall outside the rationale of the *per se* rule;

that is, where the conduct arguably furthered a public policy goal such as improving market

efficiency or increasing healthy competition.  See, *e.g.*, *U.S.A. v. Realty Multi-List, Inc.*, 629 F.

2d 1351 (5th cir. 1980).

434.    Defendants' common scheme herein acts to restrain trade and diminish

competition and market functionality for Plaintiffs and consumers.  Whether viewed under a *per

se* rule or a rule of reason analysis, Plaintiffs allege herein a restraint of trade in violation of the

Sherman Act.

435.    "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541 (1978). "It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement is in purpose and effect a boycott. *Id.* at 543 (citing L. Sullivan, Handbook of the Law of Antitrust 231 (1977)).

436.    Each of the Defendants have actively participated in, and gained economic advantage from, a common scheme, agreement, or conspiracy designed to pressure, intimidate, and/or coerce each of the Plaintiffs into complying with the Defendants' price-fixing scheme. This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to unreasonably restrain trade, so as to limit or exclude Plaintiffs' and customers' participation in the market.

437.    The common scheme involves multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; economically coercive threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers.  Each of these forms of conduct individually constitutes an unreasonable restraint of trade and a *per se* violation of the Sherman Act §1.

438.    The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott. *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 544-5 (1978).

439.    Defendants have enlisted, and continue to enlist third party consumers in need of auto repairs, as unwitting participants in their common scheme to coerce Plaintiffs and punish Plaintiffs.

440.    Evidence of concerted boycotting by Defendants against insurers includes, but is not limited to,  all Defendants making the same false statements, fraudulent misrepresentations and misleading innuendos about Plaintiffs to consumers who have identified Plaintiffs as their intended repair facility; refraining from disclosing quality of repair issues at preferred, compliant shops,  timing of boycotting to engage with intentional punishment decided upon by one or two insurers and enlisting the other Defendants into boycotting a particular Plaintiff at the same time.

441.    Defendants' ongoing conduct in furtherance of the common scheme to boycott, and thereby coerce and/or punish Plaintiffs has had substantial negative impact on the Plaintiffs' business practices and relationships, the ability of customers to freely obtain safe and full repairs, and the functionality of the relevant market.

442.    Agreement to boycott is shown by the Defendants knowledge of changed circumstances, i.e., when a Plaintiff has left another Defendants' direct repair program followed by defamatory and misleading statements to drive customers away from the defecting Plaintiff. As this information is not publicly shared, the unaffected Defendants should not have knowledge of the actions of one shop with which it is not itself even informally associated. But unaffected Defendants do have knowledge and do act upon that knowledge as a concerted group with malicious intent to harm particular plaintiffs.

443.    Agreement of purpose is also shown by the identical nature of the falsehoods and misrepresentations utilized by the various Defendants in their boycotting and steering of customers from Plaintiffs' places of business.  The nearly identical nature of the wording leads to a reasonable conclusion that an agreement was reached as to the most effective statements to use to the greatest effect.

444.    The Defendants actions are violations of federal law and have directly caused the Plaintiffs to incur substantial damages.  Defendants are continuing and will continue the aforementioned offenses unless the relief requested herein is granted.

## **PRAYER FOR RELIEF**

As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted.  The Plaintiffs therefore pray for the following relief:

A.    Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.    Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.    Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(1)    Placing into effect any plan, program or practice which has the purpose or effect of:

(a)    directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair

of damage to automobiles.

(b)    fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)    Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)    Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4)    Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.    Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.    Pre- and post-judgment interest.

H.    Any additional relief the Court deems just and appropriate.

## CONCLUSION

While this matter has many aspects and trade terms, the essence of our claim is simply this:

In the American marketplace there are two types of body shops.  There are shops who strive to serve the customer, the owner of the car, and there are those shops who believe the insurance company is their customer.  The defendants have successfully created a "market" system that rewards the body shops that will cut corners so they can increase profits and punishes body shops who are unwilling to compromise the quality or safety of the American consumers' repair.

The whole intent of antitrust actions was and is to increase competition for the benefit of the American consumer.  Defendants' actions have violated the letter and the spirit of the law. Instead of providing the best quality repairs for the lowest cost they have fixed the costs to their utmost benefit and forced the market into a race to the bottom in terms of quality to the customer.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands a judgment against all Defendants in an amount sufficient to fully compensate Plaintiffs for damages incurred as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief the Court deems the Plaintiffs entitled.

Respectfully submitted, this the 18th day of September, 2015.

**THE ONLY ONE, INC., et al**

BY:     /s/ *Allison P. Fry*
          JOHN ARTHUR EAVES, JR.
          ALLISON P. FRY

          John Arthur Eaves
          Attorneys at Law
          101 N. State Street
          Jackson, MS 39201
          Telephone:     601.355.7961
          Facsimile:     601.355.0530
          JohnJr@eaveslaw.com
          Allison@eaveslaw.com

          Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Plaintiffs' Amended Complaint* was filed electronically on the 18TH day of September, 2015, and will be served upon all ECF-registered counsel by operation of the Court's electronic filing system.  Parties and counsel may access this filing through the Court's system.

*s/ Allison P. Fry*

Allison P. Fry

JOHN ARTHUR EAVES,
ATTORNEYS AT LAW
101 N. State Street Jackson, MS 39201
601.355.7961 Tel
601.355.0530